Argued February 4, affirmed as modified March 2,
petition for rehearing denied April 5, 1960

## CAMAS LOGGING CO. *v.* HASKINS ET AL

### 349 P. 2d 852

*W. P. Riddlesbarger,* Eugene, argued the cause and filed a brief for appellants.

*Edward A. Butler,* Eugene, argued the cause for respondent. On the brief were Lombard & Lombard, Cottage Grove, and Harris, Butler, Husk & Gleaves and James C. Goode, Eugene.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY and HARRIS, Justices.

HARRIS, J. (Pro Tempore)

Under date of January 23, 1951, defendant, Haskins Lumber Company (hereinafter referred to as Haskins), entered into a contract with Timber Development Company, the owner of timberlands near Swisshome, whereby Haskins agreed to construct and operate certain sawmills to manufacture into lumber the timber which Haskins agreed to log from the lands

belonging to Timber Development Company. Haskins agreed to do everything needed to produce the lumber.

On March 15, 1951, Cope Logging Company entered into a contract with Haskins whereby Cope agreed to perform the logging operations and road construction as required of Haskins by the terms of the contract dated January 23, 1951.

On March 23, 1953, the contract was amended to provide that Haskins assume the obligation to deliver the logs to the mill from the woods, to maintain roads, and to cold-deck surplus logs.

This agreement was assigned by Cope to the plaintiff, Camas Logging Company, on September 5, 1953.

In November, 1953, Haskins purchased from Timber Development Company all the latter's interest in the timber covered by the January 23, 1951, contract.

Some time in 1954, the exact date being impossible to determine, the prior written contracts were modified by Camas and Haskins to this effect: Haskins agreed to buy and did buy a crane. Haskins agreed to furnish one man. Camas agreed in return to do all the decking of surplus logs and pay all expenses connected with doing so. The place of log scale was changed from lumber scale as sawed in the mill to log scale.

As logs were received, they would be dumped into a pond belonging to Haskins, from which some might go directly to the mill where they were scaled prior to manufacture, or they might be placed in a cold deck before which they were scaled. The cold deck logs were again scaled when they were taken from the deck to the mill for manufacture.

Logs produced by Camas during the year 1955 were placed in cold deck, from which they were removed and manufactured into lumber prior to March, 1956.

The so-called 1956 cold deck was commenced about April 23, 1956.

Camas instituted this litigation to restrain Haskins from manufacturing into lumber logs obtained by Haskins from sources other than Camas and for an accounting with reference to other operations.

The accounting with reference to the decks necessarily entailed the question as to whether or not Haskins had paid Camas for the logs which it had used in the manufacture of lumber. That problem gave rise to the question of what deductions from the price paid for the logs Haskins had made and was permitted to make. The particular deductions which were put in issue included deductions for personal property taxes for the year 1954 and the year 1955 from the price paid for logs taken for manufacture from the 1955 deck; and deductions for the repair of a piece of equipment owned by Haskins but used by Camas in making the 1955 cold deck. Camas also asked for payment for logs which were used to construct a matting or corduroy deck over which the equipment used in cold-decking moved, and for the footage of logs which were used as boomsticks at the mill pond. The court allowed the claim of Camas for reimbursement for amounts withheld by Haskins for personal property taxes and the claim for payment for the logs used in the corduroy road and the boomstick.

The findings of fact and conclusions of law of the trial court so far as material to the issues raised upon this appeal are as follows:

"1. With reference to the 1955 cold deck hereinafter referred to as the 'cold deck' it was the agreement of the parties that the plaintiff was to store logs intended for winter use in the cold deck, draw an 'advance' and be paid for logs as and when

said logs entered the sawmill for manufacture into lumber.

"2. The defendants, under the agreement between the parties, had the right to regulate and did regulate the flow of logs into the mill and the selection of logs to be manufactured in the mill.

"3. The defendants exercised dominion and control over the logs at all times after the logs were placed in the cold deck.

"4. The defendants caused all logs to be scaled, and preserved the record of such scale as and when the logs went into the cold deck. Such records were also kept for logs moving from the cold deck into the sawmill.

"5. It was the express agreement of the parties that the plaintiff would pay all of the ordinary costs incurred in the making of the cold deck.

"6. The parties did not specifically agree with reference to personal property taxes, and there was no meeting of the minds concerning the payment of taxes. Personal property tax is not an ordinary cost in the making of a cold deck.

\* \* \* \* \*

"9. The defendants were not authorized to withhold sums for shovel repairs made and deducted after the termination of the contract.

"10. The plaintiff is entitled to payment of $1,705.72 for logs used in the corduroy road for the benefit of the defendants.

"11. The plaintiff is entitled to payment for 12 thousand board feet of logs used in boom sticks at the rate of $27.50 per thousand.

## "CONCLUSIONS OF LAW

"1. The plaintiff is entitled to a decree for the sums held out by the defendants as personal property tax for a total of $5,764.58.

"2. The Plaintiff is entitled to a decree for the further sums of $196.61 for shovel repairs; $330.00

for boom sticks, and $1,705.72 for logs used in the corduroy road."

Based on the foregoing findings of fact and conclusions of law, the court entered a decree in favor of Camas in the sum of $7,996.91, with interest thereon at 6% per annum from August 1, 1956, until the date of the decree. From this decree, Haskins has appealed.

Haskins' assignments of error are stated as follows:

## "I

"The Court erred in finding that:

"(a) The Defendants exercised dominion and control over the logs at all times after the logs were placed in the 1955 cold-deck;

"(b) It was the express agreement of the parties that the Plaintiff would pay all of the ordinary costs incurred in the making of the cold-deck;

"(c) The parties did not specifically agree with reference to personal property taxes, and there was no meeting of the minds concerning the payment of taxes and that personal property tax is not an ordinary cost in the making of a cold-deck;

"(d) The Defendants were not authorized to withhold sums for shovel repairs made and deducted after the termination of the contract;

"(d) [sic] The Plaintiff is entitled to payment of $1,705.72 for the logs used in the corduroy road for the benefit of Defendants;

"(f) Plaintiff is entitled to payment for 12,000 feet of logs used in boomsticks at the rate of $27.50 per M.

## "II

"The Court erred in concluding that:

"(a) The Plaintiff is entitled to a decree for the sums held out by the Defendants as personal property tax for a total of $5,764.58;

"(b) The Plaintiff is entitled to a decree for the further sums of $196.61 for shovel repairs; $330.00 for boomsticks, and $1,705.72 for logs used in the corduroy road;

### "III

"The Court erred in decreeing that the Plaintiff is entitled to the sum of $7,996.91 with interest thereon at the rate of 6% per annum from the first day of August, 1956 until the date of the decree, together with all costs to be taxed herein."

■ The principal issue involved in this appeal is which party is obligated to pay the personal property taxes on the cold deck.

It will be noticed that the court found it was the express agreement of the parties that Camas would pay all of the ordinary costs incurred in the making of the cold deck. However, the court held that the parties did not specifically agree with reference to personal property taxes on the cold deck, and that there was no meeting of the minds concerning the payment of such taxes. The court also found that the personal property taxes were not an ordinary cost in the making of a cold deck.

It must be remembered that Camas was merely logging and hauling, and that the cold deck was located on Haskins' mill site; also that the timber and logs involved were at all times owned by Haskins. Likewise, it is significant that the general manager of Haskins testified as follows:

"A Well, my father-in-law and I were talking with Mr. Haley there, that if we would buy a two and a half yard Marion shovel and a grapple that the Camas Logging Company would put up all the cold deck, and we would furnish one man, and they would stand all expenses of putting in this deck and

tearing it back down again. And Mr. Lagler set in the corner there, and he said, 'That is more than fair, Harold, we will go along with that all the way.'"

The foregoing testimony indicates Camas was to stand "all expenses of putting in this deck and tearing it back down again." This evidence, given by Haskins' general manager, would hardly reflect an understanding Camas was to pay the personal property taxes on property located on Haskins' mill site.

Haskins challenges finding of fact No. 3, which reads as follows:

"The defendants exercised dominion and control over the logs at all times after the logs were placed in the cold deck."

However, it is significant Haskins did not challenge finding of fact No. 2, which provides:

"The defendants, under the agreement between the parties, had the right to regulate and did regulate the flow of logs into the mill and the selection of logs to be manufactured in the mill."

We concur in the reasoning of the trial court when, in passing upon the issue here involved, he stated:

"* * * the court felt from all the evidence that the plaintiff logging company in order to provide a year-around supply of logs for the mill—and the mill wanted them to do it—at least, at that time they apparently had agreed the plaintiff would not make winter roads, but he would log in the summer and build up a cold deck; and Haskins would furnish a crane and a man; and that Camas Logging Company would bring the logs in from the woods, put them in the pond, and then into the deck; and that they would pay the usual costs. By that I think the court understood the evidence to mean that they would pay the labor and trucking, and the usual

expense, and the manpower in having the cold deck constructed—but not to pay personal property tax on timber the title to which had never been vested in them and never would be  *  *  *  or anything else that would be more or less a charge against the property itself."

ORS 308.105 (2) provides in part:

"Personal property may be assessed in the name of the owner or of any person having possession or control thereof.  *  *  *. "

It is to be noted Haskins was not only the owner, but was the person having possession and control of the cold deck.

We conclude from the foregoing that plaintiff, Camas, is entitled to a decree for the sum held out by Haskins as personal property tax for a total of $5,764.58.

■ The court held that Camas was entitled to a decree for the sum of $196.61 for shovel repair. However, the undisputed evidence appearing from Camas's exhibit EE is to the effect that the repairs on this piece of equipment were made necessary because the "house lock on the crane—was broken by them [Camas]." Therefore, it is equitable Camas should be charged with these repairs in the sum of $196.61.

■ The court made an allowance to Camas of $1,705.72 for logs delivered by Camas which were not run through the mill or scaled, but which were used as matting in a corduroy road. These logs were in the cold deck at the end of the 1955 season.

Regarding these logs, Jack Ramsey, a Bureau scaler, testified as follows:

"Q  Do you recall, Mr. Ramsey, about when in 1956 the Haskins Lumber Company completed the

cutting of the logs which were in the cold deck at the end of the logging season of 1955? Do you remember about what month of the year they completed the cutting of the logs?

"A  They completely quit cutting the cold deck logs?

"Q  Out of the cold deck, yes.

"A  It must have been around March.

"Q  Are there any logs used for matting?

"A  Yes, there was.

"Q  Are there now?

"A  Yes, the logs were held over there last year.

"Q  What do you mean by 'matting'? What does 'matting' mean?

"A  It is small logs that are put to hold the shovel out to keep it from bogging down in the mud.

"Q  Approximately how much footage does that take?

"A  Well, there are 600 logs there, approximately. I would say under 100,000 feet."

We believe, therefore, that the evidence shows that these logs were delivered to Haskins and used by Haskins in 1956 when the latter completed cutting the logs which were used in the cold deck. These logs were never scaled and consequently plaintiff was not paid therefor. The fact the logs deteriorated in use would not relieve Haskins from liability. The report of the referee shows the amount and footage of the logs involved. We therefore hold this item was properly allowed Camas by the decree of the trial court.

The court made an allowance to Camas of $330 for logs delivered that were used for boom sticks. On this matter, both parties rely on substantially the same argument advanced by them with reference to the claim for logs used for matting, which has immediately

above been disposed of. The reasons announced by us for allowing the claim for the logs used as matting dispose of this claim in favor of Camas.

■ Finally, Haskins urges that the court erred in allowing interest, asserting the prayer of the complaint does not include a claim for interest. A court of equity, however, in a proper case, will grant such relief as a party is in equity and good conscience entitled to, whether such relief has been prayed for or not. *Gilmore v. Burch,* 7 Or 374. Interest is allowable in equity where principles of equity so demand. *McCarty v. Gault,* 24 FSup 977, 979 and cases there cited. We concur in the trial court's conclusion that interest should be allowed in this case.

The decree of the trial court is modified solely to the extent of charging Camas with the repairs to the shovel in the sum of $196.61. In all other respects, it is affirmed. Neither party will be allowed costs or disbursements.