Argued June 3, affirmed September 6, petition for
rehearing denied October 1, 1974

GILL ET UX, *Respondents, v.* MARQUOIT ET AL,
*Appellants.*
525 P2d 1030

*N. Robert Stoll,* Portland, argued the cause and filed a brief for appellants.

*Steven E. Benson* and *Harry V. Benson,* Portland, argued the cause and filed a brief for respondents.

O'CONNELL, C. J.

This is a suit for specific performance brought by the sellers of land to recover the purchase price. The buyers counterclaimed, seeking rescission of the land sale contract. Defendants appeal from a decree for plaintiffs.

The land in question is located in Clackamas County and is separated from the Pudding River by a county highway. In January, 1970, plaintiffs purchased the property from a Mr. and Mrs. Noe. At the time of the purchase the property was flooded by the Pudding River, and plaintiffs were aware of this. It appears from the record that this land has had a long history of annual flooding caused by the Pudding River backing up as a result of flood conditions in the lower river system.

In May, 1970, plaintiffs offered the property for sale and (shortly thereafter) on May 8, 1970, entered into an earnest money agreement with the defendants. The plaintiffs had not met nor spoken with the defendants prior to this date. Defendant James Marquoit testified that about the time of the signing of the earnest money agreement he had inspected the property and observed on the land a small pond approximately 100 feet by 200-300 feet, perhaps a foot deep, fed by a small stream approximately two inches deep.

Sometime in June, 1970, the county notified

plaintiffs that it planned to improve the road separating the property from the Pudding River. On August 20 of the same year, the county purchased about one acre of plaintiffs' land which lay adjacent to the road. It appears that this land was needed to permit the county to elevate the road in order to solve highway flooding problems that had occurred in the past. Due to the light rainfall during the winter of 1970-71, the Pudding River did not overflow its banks and the property in dispute was not flooded.

Sometime early in 1971, a land sale contract was entered into between the plaintiffs and defendants. Defendant Marquoit testified that on the day the contract was signed the purchasers met in Gill's office and that in Gill's presence he and Mrs. DesBrisay discussed the plans for the property, which included subdividing the property into building lots or constructing a trailer court there. According to Marquoit, Gill overheard and participated in this conversation. Marquoit claimed that Gill stated that the property "would be a fine place for people to live, to make building lots or a trailer court," and added, "I hope you make a million dollars," or words to that effect. Gill admitted that he heard, but denied that he took part in the conversation. He also testified that if he did make the statement about a million dollars, that "it was meaning I wished them luck on the deal." At this meeting, it appeared that Gill informed defendants that the county had taken and paid him for the land needed to make the road improvements and that as a result the purchase price was reduced from the $36,000 figure contained in the earnest money reecipt to the final contract price of $35,000.

In August, 1971, Clackamas County completed

the elevation of the road. During the winter of 1971-72, the Pudding River once again overflowed its banks and flooded fifty to eighty percent of the property. At first the defendants believed the road elevation had caused the problem and made a claim against the county on February 9, 1972. However, the county engineer convinced them that this was a recurring condition for which the county was in no way to blame and the claim was therefore abandoned.

Defendants made no payments on the contract after February, 1972. On April 6, 1972, plaintiffs' attorney sent a collection letter to defendants demanding payment. The exact date of the defendants' request for rescission of the contract does not appear in the record. However, Gill testified that he was informed by his own attorney of defendants' desire to return the property approximately two months after plaintiffs received the last payment. A letter from plaintiffs' attorney to defendants, dated April 20, 1972, stated: "Mr. and Mrs. Gill do not desire to accept the return of the property and cancellation of the contract * * *."

On July 24, 1972, the present suit was filed. Defendants counterclaimed for rescission of the contract. Prior to trial and acting on the advice of their attorney, defendants put the property up for sale.

Defendants contend that the plaintiffs had a duty to tell them of the annual flooding of the property and that their failure to do so constitutes a ground for rescission. They also contend that although plaintiffs told them that the county was going to straighten the bordering roadway, plaintiffs did not explain that the county was going to elevate the road, thereby impairing both the view from and access to the property.

Plaintiffs counter by claiming that no representations of any kind were made to defendants and that there was no duty on plaintiffs' part to inform defendants that the land was subject to recurrent flooding.

■ Defendants can prevail only if there was a duty on the part of plaintiffs to disclose to defendants the fact that the land was subjected to recurring inundation. There may be circumstances under which the seller is required to disclose that the land he offers for sale is not suitable for the purchaser's intended use. That duty does not arise, however, unless (1) the seller knows or has reason to know that the purchaser is buying the land for a specific use and that such use is not feasible because of the character of the land;[1] (2) the seller knows or has reason to know that the purchaser does not know of the character of the land rendering it unsuitable,[2] and (3) the purchaser does not have equal opportunities for obtaining information which he may be expected to utilize.[3]

■ This being an equity case, we examine the record *de novo*. As we view the evidence, an enforceable contract arose at the time the parties signed the earnest money agreement on May 8, 1970. Prior to this time defendants had no contact with plaintiffs. As a result, the latter had had no opportunity to learn of the defendants' intended use of the land and thus could not have made any representations concerning its suitability for any particular purpose. The land had been used for farming. Plaintiffs might have assumed that

---

[1] *See* Palmiter v. Hackett, 95 Or 12, 185 P 1105, 186 P 581 (1920); Musgrave v. Lucas, 193 Or 401, 238 P2d 780 (1951).

[2] Musgrave v. Lucas, *supra* note 1.

[3] Heise v. Pilot Rock Lumber Co., 222 Or 78, 352 P2d 1072 (1960). *Cf.,* Caples v. Steel, 7 Or 491 (1879).

defendants had in mind continuing the use of the land for that purpose. In addition, there was no evidence to show that plaintiffs were aware that defendants were unaware of the susceptibility of the land to flooding. Indeed, and this is a factor of principal importance here, plaintiffs, in the absence of something to suggest otherwise, were entitled to assume that defendants would, along with other inquiries usually made by those purchasing land, find out whether the adjacent river overran its banks. It is a matter of common knowledge that many rivers in Oregon frequently rise above their banks during the rainy season. The occurrence is so common that ordinarily a seller may assume that the purchaser knows, or if he does not know, he will find out whether the action of a neighboring river will affect the land being purchased.

■ Because of our view that an enforceable contract was agreed to in May, 1970, we view the subsequent agreement signed in February, 1971, as simply memorializing that contract. The price reduction then agreed to appears to us to constitute a modification of an existing contract rather than a new agreement. Consequently, any representations made by plaintiffs at that meeting were, in our view, irrevelant and cannot constitute a basis for rescission.[4]

Judgment affirmed.

---

[4] Because of our disposition of this case, we need not determine what, if any, legal significance can be attached to the defendants' attempt to resell the property on the advice of counsel after the counterclaim for rescission was filed. *See* Schuler v. Humphrey, 198 Or 458, 257 P2d 865 (1953); Scott v. Walton, 32 Or 460, 52 P 180 (1898).