# GARDNER, *Respondent,*
*v.*
# MEILING et al, *Appellants.*
## (No. A76-06-09032, SC 25131)

572 P2d 1012

Francis F. Yunker, Portland, argued the cause and filed the brief for appellants.

Gary L. Gardner, Salem, argued the cause and filed the brief for respondent.

Before Holman, Presiding Justice, Tongue and Linde, Justices, and Richardson, Justice Pro Tempore.

RICHARDSON, J., Pro Tempore.

**RICHARDSON, J.,** Pro Tempore

Plaintiff, as the buyer, brought a suit for rescission of a contract providing for the sale of a tavern. He alleged three grounds for rescission; fraud, misrepresentation and mistake. The alleged misrepresentations and mistake relate to the gross income, goodwill and reputation of the tavern. Defendants counterclaimed for the payments thus far due on the purchase price.

The court granted a decree of rescission on the ground of fraudulent misrepresentations as to income and a judgment against both defendants for return of $8,000 previously paid on the purchase price. Defendants appeal.

Plaintiff, a school teacher in The Dalles who had no experience in operating a tavern, journeyed to Portland in February 1976 and contacted Business Brokers, Inc. to inquire about the purchase of a tavern. He testified he was looking for a neighborhood tavern. James Stockard, a salesman for Business Brokers, Inc., showed plaintiff the Punjab Tavern which was owned by defendants and had been listed for sale with Business Brokers, Inc. The premises were owned by a third party and leased to defendants.

Plaintiff met on two occasions with James Stockard prior to signing an earnest money receipt. On one of these two occasions James Stockard, after determining plaintiff was new in the tavern business, explained some of the pitfalls of tavern operation to him. He explained specifically that the success of a tavern depended in large measure on the individual who operated the tavern and the persons he employed as bartenders and that the past performance of a tavern was no guaranteee the volume of business would continue. Stockard did not make any representations as to the income of the tavern and testified Business Brokers, Inc. had, in fact, received no such information from defendants.

[ 667 ]

Plaintiff and Stockard obtained, from the wholesale beer distributor, a report of the number of kegs of beer delivered to the tavern during an 11 month period in 1975. The monthly average was approximately 40 kegs. Stockard testified he told plaintiff as a rough rule of thumb a tavern could gross approximately $60 to $80 per keg. He explained this was a generalization about taverns and was contingent upon a number of factors.

Plaintiff testified, based on conversation with other tavern owners and with James Stockard, he calculated the tavern's gross income in 1975 was approximately $4,500 per month. This calculation was based solely on the average number of kegs of beer delivered in 1975. Plaintiff stated he was interested in the tavern's income but he did not depend on the keggage reports for income projections since they related to 1975 and that he was waiting for the income figures which would be given to the Oregon Liquor Control Commission (OLCC) to obtain transfer of the liquor license.

On February 20, 1976, the parties executed an earnest money agreement providing for a sale price of $40,000 to be paid $1,000 as earnest money, $7,000 on delivery of possessions of the business, $2,000 payable 90 days after possession, $2,000 on February 1, 1977 and the balance in monthly payments. The offer in the earnest money receipt was subject to the buyer obtaining a five year lease on the premises and further "subject to and is to be closed upon the granting of all licenses to operate the above business."

Approximately March 15, 1976, the parties executed a written agreement providing for the sale of the business. The purchase price and the terms of payment were the same as expressed in the earnest money agreement.

Paragraph 11 of the contract provided:
"CONTINGENCY: This agreement in its entirety is contingent upon Buyer obtaining the necessary city,

county and state licenses to operate a tavern business as now conducted by Seller. Buyer agrees to pursue all reasonable and necessary procedures to secure the said licenses. In the event Buyer does not secure the necessary licenses to operate said business as now conducted by Seller, then this agreement in its entirety shall be null and void, and the earnest money heretofore receipted for shall be returned to Buyer, except for the necessary costs incurred to that date, including attorney's fees, escrow fees, search fees, recording fees, and the like, and this agreement shall be of no further force and effect."

Although the evidence is not clear it appears the plaintiff negotiated a new lease on the premises on June 10, 1976.

On May 20, approximately two months after the contract was executed, the plaintiff and defendant Jon Meiling met with an investigator from the OLCC to discuss transfer of the liquor license. The investigator asked for the gross income figures from the tavern business for the months of February, March and April, 1976. Although there is a conflict in the evidence regarding where the figures were obtained, Jon Meiling gave the investigator gross income figures for the three months. The figures given were $5,710.50, $4,918.57 and $5,009.51 respectively. The required OLCC license was subsequently granted on June 6, 1976, and plaintiff took posession of the tavern on June 10, 1976, after the transaction was closed.

The gross income figures given to the OLCC investigator in plaintiff's presence are the only representation received by plaintiff regarding the tavern's gross income and are the basis of his claim of fraud and misrepresentation.

After taking possession of the tavern and operating it for two days plaintiff discovered the income was very low and that there were few female patrons. He contacted the bookkeeping service utilized by the sellers and learned the gross income of the tavern had

been approximately $1,400 to $2,000 during February, March and April of 1976. On June 16, 1976, a few days after taking possession, plaintiff, through his attorney, wrote to defendants demanding rescission on the basis of fraudulent misrepresentation.[1] Rescission was refused by defendants. Plaintiff continued to operate the tavern, on advice of counsel, until January 9, 1977, as he stated, in order to protect the OLCC license.

Plaintiff seeks rescission based on three theories; fraud, misrepresentation and mistake. He sets forth his allegations three counts. Count I alleges that before he agreed to purchase the tavern and lease the premises defendants represented the gross income of the tavern to be $4,400 to $4,700 per month and that the tavern had valuable goodwill and a good reputation in the community. He alleged that he relied upon these representations and would not have purchased the tavern otherwise. He further alleges the representations were false and that defendants either knew they were false or made them recklessly without knowledge as to their truth or falsity.

In Count II he realleges all the matter in Count I but deletes the allegation that the representations were knowingly or recklessly made by defendants.

In Count III, titled "Mistake," claims the earnest money agreement and the sale contract were executed under a mistake of fact as to the gross income of the tavern and that the tavern had goodwill and possessed a good reputation in the community. This count further alleges the defendants were either mistaken as to these facts or concealed them from plaintiff.

Plaintiff presented the case to the trial court on the basis of fraudulent misrepresentation. The court granted rescission on that ground and made no find-

---

[1]This letter, as conceded by plaintiff, was inartfully drawn. It demanded rescission of the *lease* contract. Defendant asserts this is not a proper notice of rescission. In view of our disposition of the case it is unnecessary to decide that issue. Whether the notice was proper, the plaintiff has failed to establish any grounds for rescission.

ings regarding other grounds for rescission. Defendants, on appeal, argue principally that the representations were not made to the plaintiff but were made to the OLCC investigator for the purposes of obtaining transfer of the liquor license. On appeal we review the record de novo and make our own findings and conclusions. If the evidence supports any theory of rescission propounded in plaintiff's complaint the decree should be affirmed. We find, however, the plaintiff has failed to establish a basis for rescission on either of the three theories in his complaint and reverse.

## I. FRAUDULENT MISREPRESENTATIONS

### A. *Gross Income*

■■ Comprehensively stated, the elements of actionable fraud allowing avoidance of a contract consist of: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon, (6) the injured party's ignorance of its falsity, (7) his reliance upon the truth of the representation, and (8) his right to rely on its truth. *Conzelmann v. N.W.P. & D. Prod. Co.,* 190 Or 332, 225 P2d 757 (1950). The person alleging fraud has the burden of proving each of the elements and failure to prove any one or more of the elements is fatal to the cause of action. *Conzelmann v. N.W.P. & D. Prod. Co., supra; Condit v. Bodding,* 147 Or 299, 33 P2d 240 (1934).

■ Implicit in the element of reliance is a requirement the plaintiff prove a causal relationship between the representation and his entry into the bargain. In other words if he fails to prove that the fraudulent misrepresentations induced him to make the agreement he has failed to establish the element of reliance.

■ As we view the evidence an enforceable contract arose at the time the earnest money agreement was signed by both parties on February 20, 1976. The formal written contract of March 15, 1976, was merely

[ 671 ]

a memorialization of this agreement. Prior to the execution of the earnest money agreement no representation regarding the gross income of the tavern had been made. Plaintiff conceded, during oral argument in this court, that the representations of May 20, 1976, made to the OLCC investigator in plaintiff's presence are the only representations respecting income that he received. Since these representations came after the binding agreement of February 20, 1976, and even after the execution of the written contract they could not have been relied upon by plaintiff in making the agreement. *Gill v. Marquoit,* 269 Or 581, 525 P2d 1030 (1974).

*Gill v. Marquoit, supra,* is particularly apropos. That case involved a suit by the seller of a parcel of real property for specific performance of the contract of sale. The buyers counterclaimed for equitable rescission based on a misrepresentation of the fact that the land was periodically flooded by an adjacent river. The sellers had offered the property for sale and subsequently entered into an earnest money agreement with the buyers. Prior to that time there had been no contact between the parties. At a later time they met and executed a written contract of sale. At this meeting, but prior to signing the contract, the parties talked about the land and the seller made the alleged misrepresentations. We held the earnest money agreement was a binding contract and any representations made after its execution were irrelevant and not a basis for rescission.

Plaintiff's theory in support of the element of reliance is that the agreement was not finalized until the transaction was closed on June 10, 1976. Closing occurred when the OLCC license to operate the tavern was granted and a lease of the premises was obtained. Plaintiff asserts he had a right up to the time of closing to withdraw the offer of purchase and forfeit the earnest money. The representations induced him, he argued, to go forward with the sale and finalize the

contract. This argument is premised on the contingency expressed in the earnest money agreement and reiterated in paragraph 11 of the contract quoted above, that if plaintiff did not obtain the required licenses the contract would be of no force or effect. This was not a condition precedent to the agreement of sale being made but was a condition upon which performance of the agreed terms was contingent. As we have said a binding agreement to purchase and sell arose when the earnest money agreement was executed.

## B. *Goodwill and Reputation*

Plaintiff alleged, in his complaint, that defendants had represented that the tavern had valuable goodwill and a good reputation. He claimed these were false representations as the tavern had no goodwill and possessed a bad reputation in the community where it was located. Plaintiff presented a number of witnesses who lived in the area near the tavern who testified the tavern had a bad reputation. Essentially, the testimony indicated the tavern had a reputation of being rowdy and was not a place to take a female companion. Plaintiff testified he investigated the reputation of the tavern after he took possession and found its reputation to be bad.

We have searched the record and have found no representations by defendants or their agents that the tavern had any type of reputation — good or bad. The evidence regarding a discussion of goodwill is scant. Plaintiff testified, in response to a question concerning valuation of the different parts of the business, that approximately $15,000 of the $40,000 purchase price was allocated to equipment and $25,000 to $30,000 was for goodwill in the business.

We cannot determine from the record how the goodwill was valued. But it appears plaintiff determined the offering price of $40,000 principally from an analysis of the keggage reports and a discussion of

the average keggage with Stockard and with friends in the tavern business. He inspected the premises on two occasions prior to making the offer and on at least two other occasions. We find there is insufficient evidence of any representation that the tavern had valuable goodwill or a good reputation to support a claim for rescission under Count I of the complaint.

## II. INNOCENT MISREPRESENTATION

■ A contract may be rescinded for innocent as well as fraudulent misrepresentations. *Lanners v. Whitney,* 247 Or 223, 428 P2d 398 (1967); *Furtado v. Gemmell,* 242 Or 177, 408 P2d 733 (1965); *Weiss and Hamilton v. Gumbert,* 191 Or 119, 227 P2d 812, 228 P2d 800 (1951). Plaintiff alleges in Count II of his complaint, as an alternative ground, that the same representations claimed as fraudulently made in Count I were innocently made. What we have said respecting the allegations in our discussion of Count I applies equally to Count II. The representation respecting income came after a binding obligation was made and is irrelevant in a suit for rescission. We have also determined there is insufficient evidence of misrepresentations regarding goodwill and reputation to establish this ground of rescission.

## III. MISTAKE

■ In Count III, plaintiff essentially alleges a unilateral mistake as to the gross income, the goodwill and reputation of the tavern. In order to avoid a contract on account of a unilateral mistake it is necessary that there be a mistake, that the mistake is basic and known to the other party, or that circumstances are such that the other party, as a reasonable person, should have known of the mistake. *G.E. Supply Corp. v. Republic Cons. Corp.,* 201 Or 690, 272 P2d 201 (1954); *Rushlight Co. v. City of Portland,* 189 Or 194, 219 P2d 732 (1950).

■■ A mistake justifying rescission must be a misapprehension as to a fact which is material and basic to

the agreement. Here the plaintiff was not laboring under a misapprehension of fact as to the income, goodwill or reputation of the tavern since he had no information respecting these matters prior to entering into the agreement. He formulated an opinion of value based on incomplete information. The applicable principle is aptly stated in Restatement of Contracts, § 502:

> "* * * * *
>
> "*f.* Where the parties know that there is doubt in regard to a certain matter and contract on that assumption, the contract is not rendered voidable because one is disappointed in the hope that the facts accord with his wishes. The risk of the existence of the doubtful fact is then assumed as one of the elements of the bargain.
>
> "* * * * *." Restatement of Contracts, §502 at 964.

Equity will not relieve a party of an improvident bargain simply because his opinion of its value proves incorrect.

■ Assuming plaintiff was laboring under a mistake as to the facts regarding income, goodwill and reputation, there is no evidence the defendants were aware of such mistake on his part. Nor is there evidence to support a conclusion that a reasonable person would have known of the mistake. *See Rushlight Co. v. City of Portland, supra.* The most typical situation is where an offer is so inconsistent with the true value of the bargain that a reasonable person would know the offeror made a mistake in his evaluation. For example a bid on a public contract which is much lower than all other bids received would put the public body on notice that the offeror has made a mistake in calculating the bid. In such instance rescission will be allowed if the offeror is not guilty of gross negligence in making the mistake, e.g., *Rushlight Co. v. City of Portland, supra.*

■ Plaintiff's offer of $40,000 for the tavern business was less than the asking price. Defendants were not mistaken as to what they were selling and there is no evidence they concealed any facts from the plaintiff

prior to execution of the earnest money agreement or the contract. There is likewise no evidence the offer was so inconsistent with the defendants' estimate of true value of the business so as to put them on notice the plaintiff must have erred in his estimates. The evidence does not support a decree of rescission under any of the theories postulated in the complaint.

## COUNTERCLAIM

Defendants sought, in their counterclaim, a judgment for the payments due under the terms of the contract. Plaintiff had made only the earnest money payment and a payment of $7,000 upon assuming possession. One lump sum payment of $2,000 was due 90 days after plaintiff took possession and a further $2,000 payment was due February 1, 1977. Neither of these payments has been made by plaintiff. The contract does not provide for interest on either of the $2,000 payments and defendants have requested no interest in their answer and counterclaim. In an action at law, a party must plead specifically a foundation for prejudgment interest on monies due. *Lithia Lumber Co. v. Lamb,* 250 Or 444, 443 P2d 647 (1968). In a suit in equity there is no need to demand interest to have it included in the decree; it may be awarded under a prayer for general equitable relief. *Stephan v. Equitable S & L Assn.,* 268 Or 544, 522 P2d 478 (1974); *Cross of Malta Bldg. Corp. v. Straub,* 257 Or 376, 476 P2d 921, 479 P2d 505 (1971); *Camas Logging Co. v. Haskins et al,* 221 Or 182, 349 P2d 852 (1960).

Defendants' counterclaim did not include such a prayer, it merely asked for judgment of $4,000. Defendants' are entitled to judgment for the $4,000 due and unpaid without prejudgment interest. They are entitled to interest on the judgment as specified in ORS 82.010(1)(b).

The decree of the court rescinding the contract is reversed with instructions to enter a decree in favor of

defendants and for a judgment against plaintiff of $4,000.

Reversed with instructions.