Argued and submitted November 8, 2004, affirmed April 26, 2006

In the Matter of the Estate of
Edward O. Tulleners, Jr., Deceased.

Michelle Antoinette GRAVES,
*Appellant,*

*v.*

Antonius Peter TULLENERS,
Personal Representative of the
Estate of Edward O. Tulleners, Jr., deceased;
and Wilhelmina O. Tulleners,
*Respondents.*

P95-1104; A120306

134 P3d 990

James N. Westwood argued the cause for appellant. With him on the briefs were Andrew R. Gardner, Louis A. Ferreira, IV, and Stoel Rives LLP.

Gary Roberts argued the cause for respondent Antonius Tulleners. With him on the brief was Schwabe, Williamson & Wyatt, P.C.

James R. Cartwright argued the cause for respondent Wilhelmina Tulleners. With him on the brief were Susan A. Miller and Brooks F. Cooper.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

.

## ORTEGA, J.

Petitioner sought to rescind, on the bases of misrepresentation and mutual mistake, an agreement apportioning proceeds of a wrongful death action or, in the alternative, to surcharge the personal representative of her father's estate for damages resulting from the apportionment agreement. After a bench trial, the trial court entered judgment dismissing petitioner's claims, and petitioner now appeals. We review *de novo*,[1] and affirm.

Petitioner's father, Edward Tulleners ("decedent"), was killed in 1995 in a helicopter crash at Crater Lake. He was survived by petitioner, then 15 years old; his elderly mother, Wilhelmina Tulleners ("Wilhelmina"); siblings who are not parties to this litigation; and his brother, Antonius Tulleners ("personal representative"), who was appointed the personal representative of decedent's estate. Although decedent had executed a document purporting to be a will and naming various family members and loved ones as beneficiaries, that document did not satisfy the statutory requirements for execution of a will. Decedent thus died intestate and, under the laws of intestacy, petitioner was the sole heir to his estate.

Shortly after decedent's death, the personal representative informed the family of a potential wrongful death action against American Eurocopter Corporation. The personal representative told petitioner that, although she would be required to split the proceeds of that action with her grandmother, Wilhelmina, petitioner would receive the "lion's share." The apportionment of those proceeds—that is, whether petitioner, the sole intestate heir, was required to share with Wilhelmina the damages awarded for pecuniary loss to decedent's estate—is central to this dispute.

The personal representative hired attorney James Huegli to pursue the wrongful death claim. Shortly after he

---

[1] ORS 19.415(3); *Myers v. MHI Investments, Inc.*, 44 Or App 467, 471, 606 P2d 652, *rev den*, 289 Or 107 (1980). The probate case from which this appeal arises was filed in 1995, and, since then, ORS 19.415(3) has been amended. Or Laws 2005, ch 568, § 27; Or Laws 2003, ch 576, § 88. The parties do not argue that the amendments affect the standard of review in this case.

was hired, Huegli sent Wilhelmina a letter manifesting his understanding of how the wrongful death proceeds would be distributed—*i.e.*, that Wilhelmina would split the damages awarded for "economic loss to the Estate" with petitioner. Because Huegli believed that the proceeds would be split, he suggested that petitioner retain private counsel to protect her interest in any wrongful death recovery.

On Huegli's recommendation, petitioner's mother hired James Pippin to represent petitioner in both the probate and wrongful death proceedings. Pippin shared Huegli's belief that any wrongful death proceeds would be apportioned between petitioner and Wilhelmina and advised petitioner accordingly. Although petitioner has since come to dispute Pippin's legal conclusions, at the time she trusted him, and she agreed at trial that he was always honest, cared for her, and was squarely in her corner.

In contrast, petitioner has believed almost from the beginning that the personal representative (her uncle) is, at least at times, dishonest. She did not approve of the way he was handling the probate estate and felt that he was not looking out for her best interests. She testified that she has always wanted him removed from his position as personal representative—and indeed, she sought his removal as personal representative in the probate court before he filed the wrongful death action, and she objected to his annual accountings and questioned his general fulfillment of his duties.

The wrongful death action, filed about a year after the accident that killed decedent, proceeded to trial in September 1997. Huegli kept Pippin informed of the status of the wrongful death case, and Pippin attended the trial and participated in at least some settlement negotiations. At the conclusion of the trial, the trial court, at Huegli's request, instructed the jury that they were not to consider how any damages awarded would be allocated. Huegli explained his reasons for making that request:

"In this case I had a young woman who was a beneficiary to this estate who was not yet out of high school. I also had a grandmother * * * who was, I think, at the time in her mid-eighties. And I was concerned that the jury would go back

into the jury room—and keep in mind that we were asking for somewhere between nine million and 40 million dollars—that they would go back and say, I don't want to give an 18-year-old or a 16-year-old this much money[;] what is she going to do with it? It's too much money to give to this person. I don't think Grandma should have this much money because she's 85 years old, and go through those type of mental gymnastics."

Huegli believed that apportionment would be accomplished by agreement.

The jury returned a special verdict in favor of the personal representative, awarding damages as follows: (1) $6,180 for funeral and burial expenses; (2) $175,800 for petitioner's education and support; (3) $28.5 million for pecuniary loss to decedent's estate; and (4) $500,000 for noneconomic damages to petitioner and Wilhelmina.

Although Huegli had not discussed with Pippin his decision to take the apportionment decision from the jury, Pippin did not object to that decision and agreed that, as a matter of trial strategy, damages should not be apportioned by the same jury that heard the underlying wrongful death action. Pippin also agreed that Wilhelmina was entitled to a portion of the $28.5 million awarded to cover damages for pecuniary loss to decedent's estate, despite the fact that petitioner was decedent's sole intestate heir. Pippin explained:

"It's what the statute says. If a judgment is entered, then [ORS 30.]050 controls. And it specifically says that the trial judge will allocate the damages. In this case Wilhelmina Tulleners had a pecuniary loss. I had heard her testify. And I knew she had a pecuniary claim as well as a non-economic claim. Therefore, I felt she was entitled to share in the entire award."

American Eurocopter appealed the award of $28.5 million for pecuniary loss, but did not dispute the award of $500,000 for noneconomic damages to petitioner and Wilhelmina. While the appeal was pending, its insurance company offered to settle the case for $6.7 million, and the personal representative and Huegli counteroffered at $20 million. During those settlement negotiations, the attorney for the insurance company, John Folawn, contacted Pippin

directly and suggested that petitioner was the sole beneficiary of the award. Pippin rejected that suggestion—and indeed, when he discussed the conversation with Huegli, they both wondered, "[W]here did [Folawn] ever come up with that idea[?]" Pippin instructed Folawn to communicate with the personal representative regarding any settlement proposals. He also informed petitioner of those communications and told her that he did not agree with Folawn's analysis.

In December 1998, while the appeal was pending, Huegli wrote a letter to counsel for American Eurocopter, demanding payment of the noneconomic damages award. Pippin was sent a copy of that letter and, sometime in early January 1999, informed petitioner, who was then 18 years old, that the $500,000 payment would soon be forthcoming. Pippin explained to petitioner that if she and Wilhelmina could not come to an agreement as to apportionment of the wrongful death proceeds, they would have to submit to apportionment by the court. The prospect of another court proceeding concerned petitioner, who had found the wrongful death proceedings to be painful. She testified later that, at that time, she was "broke" and needed her portion of the $500,000 right away, and she was concerned about how long such a proceeding might take. With these considerations in mind, petitioner and Pippin jointly arrived at the goal of getting the best apportionment possible without going to court.

Petitioner asked Pippin to send Huegli a letter proposing a 90/10 apportionment of all of the proceeds from the wrongful death action, with 90 percent of the proceeds going to petitioner and 10 percent going to Wilhelmina. Pippin sent Huegli the letter and anticipated that he would forward it to the personal representative, who they knew would be representing Wilhelmina in any negotiations concerning apportionment. Neither Pippin nor petitioner objected to that arrangement, because Wilhelmina was an elderly woman, unrepresented by an attorney, and for many years had entrusted her business affairs to decedent and the personal representative. Moreover, despite petitioner's contentious relationship with the personal representative, petitioner expressed a preference for negotiating with him directly, without the involvement of the attorneys, because she believed that she would have a better chance of reaching an

agreement quickly. Although Pippin did not agree with petitioner that she should personally negotiate with the personal representative, he testified that he "coach[ed]" her for the encounter, urging her to remind the personal representative of her and Wilhelmina's respective life expectancies.

As anticipated, Huegli forwarded the 90/10 proposal to the personal representative, who then discussed the offer with Wilhelmina. Although Wilhelmina admitted that she had no knowledge as to how the proceeds of a wrongful death action are distributed under Oregon law, she stated that she thought the 90/10 proposal was simply "not fair." Despite Huegli's advice that the personal representative negotiate with Pippin regarding apportionment of the wrongful death proceeds, the personal representative attempted to contact petitioner to discuss her proposal, leaving a message with her mother.

Petitioner returned the personal representative's phone call a few days later, and, over the course of a 95-minute conversation, they negotiated the apportionment of the wrongful death proceeds. The personal representative told petitioner that he thought the 90/10 proposal was a low offer and that Wilhelmina thought that such an apportionment was not fair. Petitioner asked the personal representative what he would consider a fair apportionment of the proceeds, but rejected his proposal of a 75/25 apportionment. After further negotiation, petitioner and the personal representative agreed on an 80/20 apportionment, with 80 percent of the wrongful death proceeds going to petitioner and 20 percent going to Wilhelmina. Petitioner later told Pippin that the conversation had gone "basically how [she] expected it to go."[2]

After petitioner's phone conversation with the personal representative, she discussed the 80/20 apportionment with her mother, who had been listening in on the conversation. Her mother told her that she did not have to abide by the agreement and could opt instead to have the court apportion the proceeds. When petitioner insisted that she did not want to go to court again, her mother called Pippin and

_____

[2] Although many details of the conversation were disputed at trial, those basic facts were not. Because the disputed portions of the conversation are not relevant to our disposition of this case, we do not resolve those discrepancies here.

instructed him to tell Huegli to expedite preparation of the apportionment agreement so that petitioner could collect her portion of the $500,000 that was to be paid out in the short term. Huegli did so, and petitioner signed the agreement on January 14, 1999, six days after her conversation with the personal representative. A week after signing, petitioner received $265,000 as her portion of the $500,000 payment made by American Eurocopter's insurer.

After petitioner signed the agreement, Pippin tried to persuade her to rescind it. He told her that an apportionment hearing would not take that long and that she could get a much more favorable apportionment from the court. Despite Pippin's advice, petitioner was concerned that she would lose at an apportionment hearing, believing that the personal representative would represent Wilhelmina's interests at the hearing and that he "always won when it came to money." Petitioner also felt that the difference between 80 percent and 90 percent of the wrongful death proceeds was not significant enough to go through another court hearing. Although she would not describe the apportionment agreement as "fair," it was "close to being fair." Petitioner testified that, at that time, there was nothing Pippin could have said to her that would have caused her to choose an apportionment hearing over the 80/20 apportionment agreement.

The Ninth Circuit affirmed the award of $28.5 million for pecuniary loss to decedent's estate and, in May 1999, the probate court approved the 80/20 apportionment agreement. Petitioner received $18,832,692 as the final distribution of her 80 percent share, and Wilhelmina received $4,664,223 for her 20 percent share.

Two-and-a-half years later, petitioner consulted with attorney Andrew Gardner about an unrelated dispute with the personal representative over decedent's former house. Gardner advised petitioner that, as decedent's sole intestate heir, she was legally entitled to all of the $28.5 million that the jury had awarded for pecuniary loss to decedent's estate. Gardner posited that, had petitioner opted for an apportionment hearing instead of entering into the apportionment agreement, the entire $28.5 million would have gone to petitioner through intestate succession, and the trial

court would have apportioned only the $500,000 awarded for noneconomic harm to Wilhelmina and petitioner.

On the basis of that legal advice, petitioner filed this action. She first sought rescission of the apportionment agreement on the grounds that either (a) the agreement was the product of the personal representative's misrepresentation that Wilhelmina was entitled to a portion of the award for pecuniary loss to decedent's estate or (b) the parties to the agreement were mutually mistaken that Wilhelmina was entitled to share that award. Alternatively, petitioner sought to surcharge the personal representative for damages arising from the apportionment agreement, which she contends resulted from "the undue influence, duress, fraud, and/or misrepresentations and breaches of fiduciary duties by the Personal Representative[.]"[3]

After a bench trial, the trial court dismissed all of petitioner's claims with prejudice. Although the court agreed with petitioner's view that, under the wrongful death statute, she would have been entitled to the entire wrongful death award for pecuniary loss to decedent's estate, the court held that petitioner was not entitled to rescission of the apportionment agreement. The court rejected petitioner's contention that the agreement was the result of misrepresentations on the part of the personal representative. Instead, the court found that the agreement was the natural product of a "collective belief" that all of the wrongful death proceeds were subject to apportionment. Although the court found that the personal representative breached his fiduciary duty of loyalty when he negotiated on behalf of Wilhelmina, the court concluded that the agreement was not the product of any misconduct on the personal representative's part:

> "Petitioner did not rely on any of the statements of the Personal Representative in making her decision, nor would [it have] been reasonable for her to have done so based on the

---

[3] Petitioner also requested that the court exercise its equitable powers to rescind the apportionment agreement, require Wilhelmina to account for funds transferred to her pursuant to that agreement, and impose an equitable lien or constructive trust on those funds. The trial court rejected those claims without discussion. Because, as discussed more fully below, we conclude that petitioner is not entitled to rescission of the apportionment agreement, we do not reach petitioner's other equitable claims.

fact she did not trust the Personal Representative and had independent legal counsel."

The trial court dismissed the remainder of claimant's arguments as "without merit."[4]

On appeal, petitioner asserts that the trial court erred in failing to rescind the apportionment agreement on the basis of either misrepresentation or mutual mistake. Petitioner also contends that the trial court erred in failing to surcharge the personal representative for his alleged misconduct, pursuant to ORS 116.063(3). Without expressing an opinion as to the proper distribution of wrongful death proceeds, we hold that even if petitioner's view of the wrongful death statute is correct, she is not entitled to rescission, nor should the personal representative be surcharged.

■ We begin with petitioner's argument that the apportionment agreement should be rescinded because it was the product of misrepresentations by the personal representative. Petitioner contends that she would not have entered into that agreement had it not been for the personal representative's misrepresentation that she was required to share with Wilhelmina the damages awarded for pecuniary loss to decedent's estate.[5]

■ Where a person makes a false representation of a material fact, and the person to whom the representation is made is induced to and does rely on that representation in entering into an agreement, " 'that is sufficient for the purpose of avoiding the contract, irrespective of the intent and

---

[4] As an alternative basis for its ruling, the trial court found that petitioner's action was untimely under ORCP 71 B. Because we affirm the trial court on the merits, we do not reach that issue.

[5] Petitioner does not assert that Wilhelmina made any misrepresentations warranting the rescission of the apportionment agreement. Neither of the parties addressed the issue of whether the personal representative acted as Wilhelmina's agent when making representations to petitioner concerning the distribution scheme for wrongful death proceeds, but we assume, without deciding, that the personal representative was acting as Wilhelmina's agent. In that event, Wilhelmina would be liable for representations made by the personal representative. *Barnes v. Eastern & Western Lbr. Co.*, 205 Or 553, 588, 287 P2d 929 (1955) ("[A] principal, who commits to an agent a duty, in the performance of which the agent will be required to make representations, is liable for misrepresentations made by him in the discharge of the duty which he employed in his efforts to serve his principal.").

purpose of the person making the false representation.' " *Kim v. Allstate Ins. Co.*, 102 Or App 529, 533, 795 P2d 582, *rev den*, 310 Or 475 (1990) (quoting *Whitehead v. Montgomery Ward & Co., Inc.*, 194 Or 106, 132, 239 P2d 226 (1952)); *accord Lesher v. Strid*, 165 Or App 34, 41-42, 996 P2d 988 (2000). To prove such reliance, a party attempting to avoid a contract on the basis of misrepresentation must "prove a causal relationship between the representation and his entry into the bargain." *Gardner v. Meiling*, 280 Or 665, 671, 572 P2d 1012 (1977). Grounds for rescission on the basis of innocent misrepresentation must be proved by clear and convincing evidence. *Lesher*, 165 Or App at 41.

We assume without deciding that the personal representative told petitioner that Wilhelmina was entitled to a portion of the damages awarded in the wrongful death action for pecuniary loss to decedent's estate and that the representation was false. However, because we agree with the trial court that petitioner did not rely on that representation in entering into the apportionment agreement, we conclude that any misrepresentation by the personal representative did not cause petitioner any injury.

To begin with, it is clear from the record that petitioner did not trust the personal representative. Petitioner testified to her belief that the personal representative did not look out for her best interests in distributing the probate estate and that he is, at times, dishonest. Rather than placing trust in the personal representative to distribute the probate assets, petitioner turned to her attorney, Pippin, to seek the personal representative's removal and to question his decisions throughout the course of the probate proceedings.

It is also clear from the record that petitioner did trust Pippin, who concurred that she would have to share the award for pecuniary loss to decedent's estate with Wilhelmina. Although petitioner now rejects that view, she agrees that she always believed that Pippin was honest, cared for her, and had her best interests at heart. Pippin initially negotiated on behalf of petitioner to apportion the award and advised petitioner as to how to approach negotiations with the personal representative to that end.

Petitioner had her own reasons for wanting to hasten an apportionment agreement—indeed, she initiated the final negotiations by instructing her attorney to propose a 90/10 split of the wrongful death award, and she proceeded with the agreement even after considering it for several days and after consulting with her mother and her attorney. In short, we find that petitioner has failed to present clear and convincing evidence that any representation by the personal representative caused her to enter into the apportionment agreement.

■ We next turn to petitioner's argument that the agreement should be rescinded because of mutual mistake— that is, that both she and Wilhelmina entered into the agreement under the mistaken belief that Wilhelmina was legally entitled to share in the damages award for pecuniary loss to decedent's estate. Assuming without deciding that the $28.5 million was not actually subject to apportionment and that both petitioner and Wilhelmina were mistaken in their belief to the contrary, we conclude that petitioner was not entitled to rescission because the agreement functioned as a release.

■ Release agreements are favored under the law because "[c]ertainty and judicial economy are served when parties can negotiate settlement of their disputes with confidence that their settlement agreements will be upheld and enforced by the courts." *Lindgren v. Berg*, 307 Or 659, 665, 772 P2d 1336 (1989). Accordingly, although release agreements may be voided if obtained by misrepresentation or unconscionable conduct,[6] mutual mistake is not a basis on

---

[6] As addressed above, we assumed without deciding that the personal representative acted as Wilhelmina's agent and concluded that the apportionment agreement was not the product of any misrepresentations on the part of the personal representative while acting as Wilhelmina's agent. The personal representative's conduct in negotiating on behalf of Wilhelmina, likewise, even if it constituted a breach of fiduciary duty, does not provide a basis for voiding the apportionment agreement. As the trial court pointed out, petitioner and the personal representative had been in an adversarial relationship for nearly three years before execution of that agreement, and throughout that time petitioner had enjoyed the benefit of independent counsel who had advocated vigorously on her behalf. Both she and her lawyer expected the personal representative to represent Wilhelmina's interests and, given petitioner's distrust of the personal representative, her other motivations, and the advice she received from her lawyer, we do not believe that the agreement was the product of unconscionable conduct on the part of the personal representative.

which to void a release agreement. *Rugemer v. Rhea*, 153 Or App 400, 405, 957 P2d 184 (1998); *Raymond v. Feldmann*, 120 Or App 452, 455, 853 P2d 297, *adh'd to as modified on recons*, 124 Or App 543, 863 P2d 1269 (1993), *rev den*, 318 Or 381 (1994).

■    A release agreement is "a contract in which one or more parties agrees to abandon a claim or right." *Lindgren*, 307 Or at 665. Both petitioner and Wilhelmina abandoned their claims for a larger portion of the wrongful death award when they entered into the apportionment agreement. Petitioner's contention that she gave up a right that she did not know she had—the right to keep all of the proceeds—does not turn the agreement into something other than a release. Even if petitioner is right that she abandoned rights different than those she thought she was abandoning, the parties nevertheless entered into a release: they both assumed that apportionment was necessary and each abandoned claims to a higher portion of the damages award than they actually received. Moreover, petitioner does not dispute that the $500,000 awarded for noneconomic loss was apportionable, that how it was to be apportioned was in dispute, and that the agreement served to resolve that dispute, thereby avoiding an apportionment hearing. Indeed, one of petitioner's primary motivations in entering the agreement was to avoid a hearing—which she would not have been able to do if she had maintained that she was entitled to the entire award. Petitioner cannot reasonably contend that the agreement did not function as a release; rather, she is contending that the release gives up too much. That the agreement may have been improvident on the part of petitioner is not a basis on which to void it. *See Raymond*, 120 Or App at 456.

■    Finally, we turn to petitioner's alternative argument that the personal representative should be surcharged for her damages arising out of his misconduct pursuant to ORS 116.063(3). ORS 116.063 provides, in part:

> "A personal representative may be liable for and is chargeable in the accounts of the personal representative with:
>
> "* * * * *

"(3)  Any *loss to the estate* arising from:

"* * * * *

"(g)  Any other negligent or willful act or nonfeasance in the administration of the estate by which *loss to the estate* arises."

(Emphasis added.) Petitioner contends that the personal representative caused a loss to the estate, of which petitioner is the sole intestate heir, when he misrepresented that Wilhelmina was legally entitled to a share of the damages awarded for pecuniary loss to decedent's estate and when he negotiated on behalf of Wilhelmina in apportioning those damages, thereby breaching fiduciary duties owed to petitioner.

Assuming petitioner's allegations to be true, there nevertheless was no "negligent or willful act" on the part of the personal representative that resulted in "loss to the estate." Wrongful death actions are brought

"for the benefit of the decedent's surviving spouse, surviving children, surviving parents and other individuals, if any, who under the law of intestate succession of the state of the decedent's domicile would be entitled to inherit the personal property of the decedent, and for the benefit of any stepchild or stepparent whether that stepchild or stepparent would be entitled to inherit the personal property of the decedent or not[.]"

ORS 30.020(1). Wrongful death actions are not brought for the benefit of a decedent's estate, but rather for the benefit of those entitled to share in the proceeds. *See Hughes v. White*, 289 Or 13, 16, 609 P2d 365 (1980) ("We have said that the personal representative, when bringing an action for the wrongful death of [the] decedent, acts solely for the benefit of the persons entitled to share in its proceeds."); *Horwell v. Oregon Episcopal School*, 100 Or App 571, 574, 787 P2d 502 (1990) ("[W]rongful death actions may only be brought by the decedent's personal representative for the benefit of the designated beneficiaries[.]"). *See generally Mendez v. State of Oregon*, 64 Or App 581, 586-87, 669 P2d 364 (1983) (explaining that the 1973 amendments to the wrongful death statute eliminated language allowing for an action to be brought on behalf of the estate). Therefore, any "negligent or willful act"

on the part of the personal representative with regard to the apportionment of the proceeds of the wrongful death action could not have resulted in "loss to the estate" that would provide a basis for surcharging the personal representative under ORS 116.063.[7] It follows that the trial court did not err in rejecting petitioner's surcharge arguments.

Affirmed.

---

[7] Indeed, even if we were to accept petitioner's suggestion that she as the sole intestate heir can somehow be equated with the estate so that loss to her is "loss to the estate," we have already concluded that misrepresentations or unconscionable conduct of the personal representative did not cause petitioner to enter the apportionment agreement.