Argued October 6, 1948; affirmed January 11; motion to remand
denied February 8, 1949

## BOGLE *v.* PAULSON
### 201 P. (2d) 733

*S. J. Bischoff,* of Portland, argued the cause and
submitted a brief for appellant.

*Harry G. Hoy,* of Portland, argued the cause for
respondent. On the brief were Hoy and Prag, of Port-
land.

Before ROSSMAN, Chief Justice*, and BELT, BAILEY
and BRAND, Justices.

212

ROSSMAN, J.

This is an appeal by the plaintiff from a decree of the Circuit Court which dismissed his suit. The latter was instituted for the purpose of securing a decree holding that (1) the appellant and the respondent, on April 7, 1946, became joint adventurers in the business of dealing in stands of timber; (2) the alleged joint enterprise purchased three tracts of timber that were later sold by the respondent at a profit; (3) one-half of the profit belonged to the appellant; (4) the respondent should render an accounting; and (5) the appellant is entitled to judgment for one-half of the profit. The answer denied that the parties were joint adventurers. The respondent admitted that he purchased the three tracts of timber described in the complaint and that he later sold them at a profit.

The appellant submits only one assignment of error; it is:

"The court below erred in holding that plaintiff failed to sustain the burden of proof and to establish the existence of the joint adventure described in the complaint."

The appellant's brief says:

"The case presents a question of fact as to the agreement between the parties * * *. The court below held that the plaintiff failed to establish the existence of a joint adventure. Appellant contends that he established the allegations of the complaint by a preponderance of the evidence * * *.

"The case is here for trial de novo."

---

* Chief Justice when this case was argued.

The respondent's brief says:

"The only question involved in this case is the nature of the business relationship between the parties, appellant and respondent, * * *."

It will be observed, not only from the assignment of error, but also from the quotations from the briefs, that this appeal submits an issue of fact only.

As already indicated, the appellant claims that the relationship between him and the respondent was that of joint adventurers. The respondent contends that the relationship between the parties in regard to the timber described in the complaint was that of employee (appellant) and employer (respondent). He concedes that in regard to some other timberlands that the parties had in contemplation, but which were not purchased, they intended to become joint adventurers.

The appellant, who is 57 years of age, as a witness, described himself as having been for many years engaged in "logging, all work in connection with logging and cruising timber, logging operations, sawmill operations." The respondent, who is 72 years of age, swore that he had dealt in timberland for 30 or 35 years. He testified: "I am a timber cruiser. * * * I logged for the Ralph L. Smith Lumber Company, and then I was in the sawmill business for about seven or eight years, and outside of that I worked in the woods cruising timber." We shall have frequent occasion to mention the Ralph L. Smith Lumber Company and shall term it the Smith Company.

The properties involved in this suit are: (1) Twelve million feet of timber that stood in widely separated groves upon a ranch of 25,000 acres in Grant County belonging to a firm known as Keerins Bros. Not all of the numerous sections of land which made up the 25,000 acres were contiguous; they lay in four town-

ships. (2) A tract of 160 acres owned by James P. Kearns upon which stood more than a million feet of timber. And (3) another tract of 160 acres containing about a million feet of timber owned by Mary F. Hurm. The Kearns and Hurm quarter sections lay within the perimeter of the area that included the Keerins Bros. ranch.

According to the complaint, the purported joint adventure was formed April 7, 1946. A month or more after that day the respondent purchased (1) the Keerins Bros. timber; (2) the Kearns quarter section; and (3) the Hurm quarter section. Shortly after the respondent purchased those properties he sold them at a profit of $36,000.00 to the Smith Company. The appellant contends that the respondent made the purchases and the sale pursuant to the terms of the alleged joint enterprise agreement. The respondent refutes that contention and says that he made the purchases and the sale in the normal course of his timber transactions.

In March, 1946, the respondent was the owner of a tract of land in Grant County containing 21 million feet of timber. The tract lay in the general vicinity of the three stands of timber above mentioned. March 15 a real estate broker introduced the appellant to the respondent as a prospective buyer of his timber. It was in that way that the two men met. Prior to that time, so far as we can discern from the record, the respondent had never heard of the appellant. The relation of the tract that the respondent owned, and which contained the 21 million feet, to the issues of this case is only incidental. The appellant claims that the respondent gave him an oral option to purchase the 21-million-feet tract, that he (appellant) later sold the option to the Smith Company, and that in making

the sale he discovered that the Smith Company was anxious to purchase all available timber in the locality in which the 21 million feet stood.

The next occasion of significance to which the appellant, as a witness, referred was April 27, 1946. He swore that on that day he encountered the respondent in Burns and told him that the Smith Company was desirous of purchasing all available timber in the general vicinity of the respondent's tract. According to him, the respondent said "that sounded good" and added that he "would get busy and line up" stands of timber. The appellant said that he did not see the respondent again until "about May 8th" when he met him in John Day and was told by him that he had obtained an option of 40 days upon the Keerins Bros. timber. We shall shortly quote from the brief filed by appellant's counsel his complete version of what occurred on May 8, but now advance to the next meeting of the two men which took place May 16 in Burns. At that time, so the appellant claimed, the respondent told him he had been unable to obtain a timber cruiser to calculate the amount of the stand upon the Keerins Bros. ranch. Before the conversation of that day was ended the joint adventure agreement was effected— if the appellant's version of the incident is true. May 16, at the close of the conversation, according to further testimony given by the appellant, he and the respondent went into the Keerins Bros. timber and began their operations as joint adventurers. Although the complaint alleges that the purported joint adventure was effected April 7, we shall see from quotations from the appellant's brief that the appellant claims that on May 8 the respondent made overtures looking toward the joint adventure, that on May 16 he couched his offer in specific terms, and that on that day he (appel-

lant) accepted the offer and the joint adventure was begun. We now quote from the appellant's brief:

"On May 8, plaintiff met Paulson in John Day, Oregon. Paulson told him that he gotten an option from Keerins Bros. for 40 days on timber they owned, that he did not know how much timber there was. Paulson said that the timber had not been cruised so far as he knew and he told Bogle that if he would locate the timber, make a preliminary cruise and investigate it and if it was found to be a good tract of timber, that he would purchase the timber and that 'we would split fifty-fifty on the profits on a deal of that kind.' He also told Bogle that when the timber was cruised and it was found undesirable that 'I would stand my own time and expense in doing that on any tract of timber.' Bogle told Paulson that was agreeable to him.

"On May 16, Bogle and Paulson met at Burns, Oregon. Paulson told him that he had obtained the option from Keerin Bros. for 40 days, that ten days had already lapsed and that he had been unable to get a cruiser 'to get in there and assist me in cruising this timber.' Paulson said, 'I am unable to do that work myself' and 'I am too busy in other transactions in Northern California.' Paulson asked Bogle if he would be interested in going in there and making a preliminary cruise of the timber, determine the lines on which the timber stood, etc., that he would go in with me on a 'fifty-fifty basis on that deal.' Paulson emphasized the fact that Bogle was doing this work on his own, taking his own chances. He told Bogle, 'We don't know what is in this tract of timber. If this timber doesn't show a satisfactory cruise and we can't make any money on it, you will be out your time and expense of doing the work.' They both went up into the Keerin Bros. timber, opened up camp. Paulson got out his plats and books and they went over the timber together. The land was scattered over four or five townships. They checked the different parcels of land to determine what might have timber on them.

"While they were investigating that timber it came to their attention that there were several private tracts of timber intervening in the area in which the Keerin Bros. timber was located. Paulson mentioned the fact, 'We could check the cruise on these tracts and he especially mentioned the Kearns and Hurm tracts in sections 16 and 26.' He said, 'I have made a hurry up cruise on this timber about a year ago and I would like to have you go in there and check these two.' 'They looked like pretty fair tracts. Check those for verification and report on your return.' It was agreed that the Hurms and Kearns tracts should be included in their deal."

Thus we see it is the appellant's contention that at the outset the agreement pertained only to the timber upon the Keerins Bros. ranch, but that as the work upon that property progressed the terms of the alleged agreement were amended so as to bring within the joint adventure the Kearns and Hurm tracts. The agreement required the appellant, so he claimed, to locate the timber, investigate it and make a preliminary cruise of it. In turn, it imposed upon the respondent the duty of purchasing the timber and paying to the appellant one-half of all profits derived from a sale of the timber. Nothing was said by the appellant as to how the situation should be handled if a loss arose from a forest fire or a failure to make a profitable resale. Before the work upon the Kearns, Hurm and Keerins Bros. tracts was completed, the agreement was again expanded, according to further contentions of the appellant, to require him to locate desirable bodies of timber, investigate them and make preliminary cruises of the timber upon them. The further agreement cast upon the respondent the duty to purchase all of the desirable tracts and give the appellant one-half of the profits derived upon a resale. The appellant swore that after

the amended agreement was effected he investigated and made preliminary cruises of four or five tracts, in addition to the Hurm, Kearns and Keerins Bros. properties. He conceded that none of these additional tracts was purchased.

The respondent's version of what occurred in the period of time to which the appellant referred is very different. Before he gave his account, he denied that the appellant had held himself out as a timber cruiser and also denied that he engaged him to do timber estimating. He conceded that he met the appellant March 15 in Portland, but denied that he gave him an option to purchase his aforementioned tract containing 21 million feet of timber. If he saw the appellant April 27 and May 8, that fact was not mentioned by him when he testified. He conceded that he conversed with the appellant in Burns on or about May 16 and upon that occasion hired him to locate the groves of timber that stood upon the extensive Keerins Bros. ranch and to run the compass for him when he (respondent) would cruise the timber. He denied that his information that the Smith Lumber Company was desirous of buying timber in Grant County came from the appellant. He swore that he had been for several years the logging superintendent for the Smith Company, that he was well acquainted with the officers of the company and had sold the latter millions of dollars worth of timber, including his aforementioned tract of 21 million feet. The sale just mentioned took place in the early part of May, and the respondent said that at that time a Mr. Hood, who was the timber buyer for the Smith Company, told him of the Company's desire to acquire all available timber in that area.

A year or more before he met the appellant, the respondent had become familiar with the Kearns, Hurm

and Keerins Bros. tracts. In that period he had exchanged some letters with Mr. Kearns and Miss Hurm looking toward the purchase of their properties. He had also conducted negotiations with the Keerins Bros. and had cruised all of the timber upon one of the townships which comprised their ranch. If he told the truth, he had carefully cruised, about a year before he encountered the appellant, the timber upon the Kearns and Hurm tracts. The respondent was a competent cruiser.

May 10, 1946, the Keerins Bros. signed and delivered to the respondent an option instrument which gave him a 40-day period in which to purchase their timber for the sum of $32,500.00. It will be recalled that the appellant testified that he told the respondent, on April 27, in Burns, that the Smith Company was anxious to buy all available timber in that area. Although the appellant testified that he met the respondent in Burns April 27 and then gave him the information just mentioned, the respondent swore that the meeting in Burns occurred eight or ten days after he had received the option.

The respondent testified that it was necessary for him to know how much timber stood upon the Keerins Bros. ranch before he exercised his option because the latter did not call for the payment of so much per thousand feet, but required the lump sum payment of $32,500.00 cash. Only forty days were available for making the cruise and, as we have indicated, the timber stood in scattered groves over a vast area. The respondent sought to find a timber cruiser in Eugene who could help him with the cruise, but his efforts failed. He thereupon went to Burns and while there encountered the appellant. He was positive that his meet-

ing with the appellant occurred after May 10, the date of the option, and explained that by that time eight or ten days of the 40-day option period had passed. The respondent swore that the services he wished were those of a helper who could locate the general boundaries of the Keerins Bros. ranch and the "spots of timber here and there" that stood upon it, as well as run compass for him while he cruised the timber. If his explanation is correct, he had no thought of hiring the appellant as a timber cruiser and the appellant had made no claim of being one.

The respondent swore that he explained to the appellant that he was not sure of the amount of timber covered by his option and that the latter might prove to be valueless. According to his version, he told the appellant he would pay him wages for his work in any event and would pay a bonus if the ranch contained sufficient timber. After these explanations had been made, the appellant, according to the respondent, replied that he was free to accept employment. We now quote from the respondent's testimony:

> " 'Well', I said, 'I'll tell you what I'll do. If it turns out good', I says, 'I'll give you a bonus out of it; otherwise you'll get wages, the going wages for that kind of work.' That is exactly the conversation we had, and he accepted it, and I went out and bought grub right there and we went out that same day."

In short, the respondent testified that no agreement for a joint adventure was made. According to him, the appellant entered into his employ and he bound himself to pay the appellant going wages for the kind of work for which he was hired together with a bonus if a favorable amount of timber were found upon the ranch.

Both the appellant and the respondent agreed that immediately after the conversation that took place on or about May 16 had been concluded the two drove to the Keerins Bros. ranch and began their operations. We deem it unnecessary to describe the work they performed. The appellant concedes that he finished all of his work upon the Keerins Bros. ranch by June 19 or 20. He swore that in the meantime he cruised the timber upon the Hurm and Kearns tracts. The respondent refuted that testimony and swore that he himself had made a complete cruise of the timber upon both of those tracts a year before he met the appellant.

The respondent testified that after he obtained his option from Keerins Bros. that firm acquired an additional section of land which contained a stand of timber that he wished to own. He conceded that he made an offer to the appellant for his services in working out that contemplated transaction and that the offer proposed an equal division of profits. While the work upon the Keerins Bros. tract was under way the appellant mentioned to the respondent two other tracts of nearby timberland, and expressed a belief that options upon them might be obtainable. According to the respondent, he and the appellant agreed that if they could sell those tracts at a profit without entailing the respondent in the investment of any of his money in them, each should have one-half of the profits. It is those three tracts of timberland, and not those mentioned in the complaint (Kearns, Hurm and Keerins Bros.) concerning which the respondent admits that he agreed with the appellant upon an equal division of profits.

We deem it unnecessary to set forth a further review of the evidence. The appeal submits only issues of fact. If the appellant's testimony is believed, he and

the respondent were joint adventurers in the timber transactions he described. If the respondent's testimony is true, his relation to the appellant with regard to the timber mentioned in the complaint was that of employer. Each supported his contention with evidence. A decision fortified by quotations from the record could be written either way. The appellant was the only witness upon his side of the case. The respondent was corroborated upon a minor phase of the issues by the testimony of his wife. The owner of the aforementioned Kearns tract testified that the respondent negotiated for the tract a year and a half before he purchased it. No other witnesses gave testimony. The outcome of the case is dependent upon whether one believes the appellant or the respondent. Anyone who accepts the appellant's version will possibly feel that the respondent took advantage of a tip given to him by the appellant that the Smith Company was in the market for Grant County timber and, through the use of the information, made a large profit. Those who accept the respondent's version will very likely believe that the appellant is endeavoring to reap where the respondent, and not the appellant, has sown. The respondent tendered to the appellant $1,500.00 in payment of his services.

In endeavoring to persuade us to disregard the trial judge's appraisal of the evidence, the carefully prepared brief of appellant's counsel emphasizes the fact that the respondent, as a witness, at times employed terms and expressions that were vague, equivocal and contradictory. It quotes the following answer made by the respondent:

"I hired him and told him if this timber turned out well, I would make it worth while—over and above his wages for that kind of work."

It contrasts that answer with the following testimony which he also gave:

"Q. Had you agreed upon any wages?
"A. No, no wages were agreed upon, no, nothing was said about wages.

"Q. Did he mention anything about wages?
"A. He did not, not at all.

"Q. Did you mention anything about wages?
"A. No."

Next, the appellant's brief calls attention to the following answer given by the respondent:

"I met Mr. Bogle at Burns and I asked him if he was busy and he said no * * *. 'Well', I said, 'I'll tell you what I'll do. If it turns out good,' I says, 'I'll give you a bonus out of it; otherwise you will get wages, the going wages for that kind of work.' "

The brief contrasts that declaration with the following:

"Q. Did you, in that conversation on May 16, in Burns, say to Mr. Paulson—Mr. Bogle—that if the cruise didn't turn out satisfactorily, that you would pay him wages for the work he did in connection with that timber?
"A. I don't think there was anything of that said.

* * *

"Q. Now, the fact is, nothing was said about wages in that conversation?
"A. There wasn't anything said about wages, no.

* * *

"Q. You now have included the statement about wages.
"A. * * * I didn't set no wages; there was no wages set, there was no wages set. We didn't talk about no wages."

We have mentioned the fact that the respondent swore that if a favorable amount of timber was found upon the ranch he would give the appellant, in addition to wages, a bonus. In one part of his testimony the respondent, in lieu of the word "bonus" employed the phrase, "make it worth while." The appellant's brief quotes the following from the respondent's examination:

"Q. Now, in that same conversation on the 16th of May, in Burns, did you tell him you would give him a bonus, or did you just have that in your mind that you would?

"A. I told him that I would make it worth while for him if the timber turned out well. Now, that is what I said to him.

"Q. But nothing was said about bonus?

"A. No 'bonus' or 'worth while' either. I figured on giving him something if the timber turned out all right.

"Q. You don't know which you said, 'bonus' or 'worth while', isn't that right?

"A. I don't remember either one, but that is —it was—that was what was said there anyway."

In further attempts to show that the respondent contradicted himself, the appellant relies upon letters written by the respondent to the appellant, more particularly upon a letter written June 27, 1946, and another written September 9, 1946. From the former, we quote the following part:

"I hope the Cruise is Finished on the Kearns timber by now."

The material part of the other is:

"Have not got the Kearns Deal settled yet. or Closed. the Papers had to be sent East to be Signed they may be back in a few days will let you know."

The appellant argues that those two statements con-

tradict the testimony given by the respondent that the appellant had no interest in the transaction concerning the Kearns tract and that he was never requested to cruise the timber upon it.

The appellant cites § 2-204, O. C. L. A., which declares that the presumption that a witness speaks the truth may be overcome "by contradictory evidence." Section 2-111, O. C. L. A., says:

> "That evidence is deemed satisfactory which ordinarily produces moral certainty or conviction in an unprejudiced mind. Such evidence alone will justify a verdict. * * * ."

The appellant argues that the respondent contradicted himself to such an extent that his evidence can not support the challenged decree.

We shall first determine whether or not the statements we quoted from the letters contradict the respondent's testimony that the appellant had no interest in the Kearns timber and had not been asked to cruise it. The respondent's brief states that in typing the letters the name "Kearns" was used inadvertently where "Keerins" was intended. Although the letters were signed by the respondent, the typing was done by his wife whose workmanship plainly denotes that she is not a trained typist. Five letters which she ran off on her typewriter are before us as exhibits. They contain some misspelled words, poor composition and many errors in punctuation. Some of the errors are material to the inquiry as to whether "Kearns" was used when "Keerins" possibly was intended. For instance, the respondent's wife in all of the letters spelled the appellant's name as "Bogal". She misspelled the name "Coeur d'Alene" as "Corde Dalane". One of the letters speaks of "the Keerns Bro Timber"

and another, after first using the term "the Keerns Timber" refers to "Sec 16-16-27 that Keerns own." We think that the contents of the letters and evidence before us indicate that all three references were, in fact, to the Keerins Bros. timber. The errors in spelling of which we have just taken note justify us in inquiring whether or not the respondent's wife typed the name "Kearns" in the letters of June 27 and September 9 when "Keerins" was intended. As we said in a preceding paragraph, the appellant conceded that he completed his work in the Keerins Bros. timber by not later than June 20. In making that statement, he included in his broad designation of Keerins Bros. timber the Kearns quarter section. He said that on either June 19 or 20 he came out of the Keerins Bros. timber and took up other affairs. Accordingly, when the respondent wrote on June 27: "I hope the Cruise is Finished on the Kearns Timber by now." he could not have had in mind anything the appellant was then doing upon the Kearns tract. By that time the appellant had quit the area around the Keerins Bros. ranch. When that letter was written, cruisers in the employ of the Smith Company were cruising the Kearns and Keerins Bros. timber. The letter written September 9, it will be recalled, said: "Haven't got the Kearns Deal settled yet *  *  * the Papers had to be sent East *  *  *." Kearns lived in Portland and there was nothing concerning the transaction with him which required the sending of a paper to the East. If the trial judge concluded that the word "Kearns" was used when "Keerins" was intended, we think that he was warranted in so doing.

Now we face the problem as to whether or not the respondent discredited himself as a witness by giving

the contradictory account of the alleged terms of his agreement of which we have taken note. At one time during his examination the respondent referred to himself as "an uneducated fellow." It appears from the record that he is afflicted with partial deafness. During the progress of his examination, so we glean from the record, he was required to pause while he adjusted a hearing aid. We observe from a notation in the record that the appellant's counsel offered an apology to the trial judge for shouting during his cross-examination of the respondent. The transcript of evidence indicates numerous requests by the respondent for a repetition of questions.

A deaf person is at a disadvantage upon the witness stand. It is a matter of common observation that many afflicted with impaired hearing are sensitive upon the subject. They covet no attention for their affliction and the shouted voice is disconcerting to them. Frequently the deaf prefer to risk a misfit answer to a question, which was heard only partially, rather than ask for a clearly spoken repetition of the question.

Whether or not the foregoing is the explanation of the difficulties of which we have taken notice, we do not know. We observe, however, that upon examination by his own counsel, the respondent, upon being asked for a fact, gave his impression, and upon being asked for a conversation, did not repeat what he had heard but gave the substance. Not all truthful persons make good witnesses, and not all good witnesses are truthful. Many laymen of good character find it impossible to realize that a question that calls for the terms of a parol contract requires them to repeat what was said when the negotiations were under way, and not to give their conclusions. Likewise, some persons

of unquestioned veracity, when endeavoring to delineate an agreement concerning wages, become confused in regard to the amount of wages and the obligation to pay them. Upon the witness stand, some persons are at their worst; to them it is a pillory.

■ Section 9-202, O. C. L. A., says that, upon appeal, suits in equity "shall be tried anew without reference to such findings" and § 10-810 provides that "upon an appeal from a decree given in any court the suit shall be tried anew upon the transcript and evidence accompanying it." This court has many times held that even in equity proceedings the credibility of the witness is primarily a question for the trial judge, and that although the chancellor's findings are not conclusive on appeal, they are entitled to much weight. Three recent instances are: *Biersdorf v. Putnam,* 181 Or. 522, 182 P. 2d 992; *Gilliam v. Schoen,* 176 Or. 356, 157 P. 2d 682; and *Public Market Co. v. Portland,* 171 Or. 522, 130 P. 2d 624, 138 P. 2d 916.

All that we have before us as a result of the trial which was held in the Circuit Court are the words that the witnesses uttered. Many times the countenance of the witness and the tale it tells are a more reliable index to the truth than the witness's tongue. The tongue is subject to the witness's studied volition, but his manner, his gentures, his passions and the tone of his voice may be unwitting. A meditated, carefully thought-out answer, even though it dovetails perfectly with the rest of the witness's testimony, may be less convincing than testimony given readily and without delay by another whose answers do not always accord.

We do not believe that the fact that the respondent at times contradicted himself requires a holding that his testimony is unsatisfactory. He may not have heard correctly the questions that were addressed to

him; the shouted voice may have confused him; or, like many others, he may have been unable to transfer readily from his mind to his tongue the facts he wished to utter. It is evident that the trial judge believed him and did not attribute his defects as a witness to an absence of good character. We think that we ought to defer to the trial judge's appraisal of this witness.

■■ The appellant had the burden of proof: § 2-301, O. C. L. A. That burden, so far as it concerns this appeal, requires him to satisfy us that his version of the disputed issues reflects the truth. To be specific, it means that the appellant must convince us that the respondent, who appears to be a man of substance, agreed to purchase all timber lands recommended by the appellant and, upon a resale, give the latter one-half of the profits. The appellant was almost a stranger to the respondent, and the purported arrangement could readily have involved the respondent in the investment of large sums of money. If the alleged agreement was made, it thrust virtually all of the risks upon the respondent; that is, if losses were incurred, the respondent alone would bear them, but if profits were made, the appellant would receive one-half of them. No argument is required to show that the losses could have been very heavy. For a man of substance, well versed in timber and timber transactions, to enter into such an arrangement with one who was almost a stranger to him would appear anomalous; especially, if the transaction was evidenced by no written memorandum whatever.

The appellant, in our belief, did not discharge the burden of proof. We find no merit in the assignment of error.

The attacked decree is affirmed.