Argued and submitted May 13, 1998; resubmitted En Banc April 14, affirmed by an equally divided court September 22, 1999, petition for review denied February 15, 2000 (329 Or 651)

MARIAH INVESTMENTS, LTD.,
an Oregon corporation,
*Respondent,*

*v.*

Douglas McCABE,
*Appellant.*

(9505-03653; CA A95435 (Control))

Douglas McCABE,
*Third-Party Plaintiff,*

*v.*

Ray WHITE
and Thelma White,
*Third-Party Defendants.*

(9509-06229; CA A95436)

Tina Lacheryl WRIGHT,
*Respondent,*

*v.*

Douglas W. McCABE,
*Appellant.*

(9509-06229; CA A95437)
(Cases Consolidated)

986 P2d 1209

Ridgway K. Foley, Jr. argued the cause for appellant. With him on the briefs were Ridgway K. Foley, Jr., P.C.; Greene & Markley, P.C.; Kennedy Bowles, P.C.; and Michael D. Kennedy.

Darleen Darnall argued the cause for respondent Tina LaCheryl Wright. With her on the brief were Dennis M. Paterson and Davis Wright Tremaine.

No appearance by respondent Mariah Investments, Ltd.

Before Deits, Chief Judge, Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler and Brewer, Judges.

PER CURIAM

Affirmed by an equally divided court.

Wollheim, J., concurring.

Landau, J., dissenting.

**WOLLHEIM J.,** concurring.

At issue in these consolidated cases is the ownership of a residence in Portland. Plaintiff Tina Wright sold the property to defendant Douglas McCabe for a purchase price of $5,000. Wright, however, contends that she was mistaken as to the existence of property taxes owed on the property, as well as to the value and condition of the property. Wright seeks to rescind her sale to McCabe. Before that transaction, plaintiff Mariah Investments, Ltd. (Mariah) had investigated the property and discovered that Wright and her predecessor in title had not paid taxes on it for many years. Mariah, concluding that Wright essentially had abandoned the property, paid the back taxes. When Mariah learned of Wright's sale to McCabe, it initiated an action to establish an equitable lien in the amount of the back taxes paid (CA A95435). At the same time, Mariah entered into an agreement with Wright to finance an action for rescission of the sale to McCabe in exchange for cash and transfer of title to the property to Mariah. Wright then initiated a separate action for rescission (CA A95437). The trial court held in favor of Wright and ordered the sale to McCabe rescinded. In light of the agreement between Mariah and Wright, the trial court held that Mariah's claim for an equitable lien was moot. McCabe appeals. I would affirm.

The disputed property is a residence located on two lots in Portland. Jessie Lynch, Wright's mother, originally owned the property, although she and Wright lived in Anchorage, Alaska. In 1986, Lynch transferred the property to Wright. Wright, however, did not take an active role in taking care of the property. Lynch continued to manage it and from time to time arranged for family members to live there rent free. Lynch could not afford to pay taxes on the property and, since 1986, she paid none. Lynch did not keep Wright apprised as to the property's condition or value, although periodically she would tell Wright about needed repairs or about taxes that needed to be paid to avoid foreclosure.

In 1991, Wright became unemployed and began drawing public assistance. In 1992, she received a personal injury settlement and applied $2,000 of it to the back taxes on

the property, leaving a balance of $7,000 still owing. For the next three years, however, neither Wright nor Lynch made any tax payments on the property; both believed they had lost the house to tax foreclosure at least a year before the 1995 conveyance to McCabe.

In 1994, Mariah became interested in the property. Mariah specializes in the purchase and development of distressed property and had discovered that $20,000 in back taxes had accrued on Wright's p operty. Mariah, however, could not locate Wright, whose Alaska address was not included in the property records. Multnomah County had foreclosed Wright's property, and Wright's statutory right of redemption had expired. However, on inquiry with the county, Mariah took advantage of an extended period of redemption to restore title in Wright by paying the back taxes on or about December 30, 1994.

At approximately the same time, McCabe also became interested in the property. He is a business person with two college degrees. McCabe, too, specializes in the purchase and development of distressed properties and, in 1995, had been in the real estate business for 10 years. Mariah approached McCabe with a proposal to form a partnership to establish an equitable mortgage or receivership. McCabe declined the offer. Instead, he hired a private investigator to locate Wright and deal with her directly. The investigator ultimately located Wright in Alaska.

On April 19, 1995, at approximately 5:00 p.m., McCabe met with Wright. Coming into the meeting, McCabe knew that the property was valued at over $100,000 and that the back property taxes had already been paid. He also knew that Wright was a young, single mother of four children who had been living on public assistance for some time. He had a copy of her criminal record and knew she had two convictions for shoplifting—one for stealing cough medicine and a second for stealing shampoo. McCabe knew Wright's income, education level, and driving record.

When McCabe arrived at Wright's apartment complex, she had been attending a party and had been drinking heavily and using cocaine. According to Wright's own estimates, she had consumed up to seven tall mixed drinks with

three shots of alcohol each. She met McCabe in the parking lot and left with McCabe in his car. McCabe told Wright that he was interested in her property. Wright was surprised that she still owned the property; she had assumed it had been lost to foreclosure because of the unpaid taxes.

From this point, Wright and McCabe recalled their conversation differently. Wright recalled that McCabe told her that taxes were owed on the property and that the house was "run down." Wright testified that she envisioned the house as an "abandoned shack," thought tax foreclosure was imminent, and under those circumstances, was willing to sell the property. Wright recalled that she suggested that she should consult with her mother before agreeing to sell the property but that McCabe told her that involving a third person would make the transaction "more complicated." Wright also recalled suggesting that she consult an attorney but that McCabe again told her that it was not a good idea and that, in any event, by that time of day she could not find one.

Wright recalled that McCabe did not pressure her into selling the property but that she understood that he was in a hurry to conduct business with her "right then" so that he could return to Portland. Wright, in need of money, testified that she believed she had to sell the house quickly or lose the opportunity forever. According to her version of events, she offered to sell the house for $10,000, but McCabe refused, saying that he would not pay more than the taxes that were owing on the property, which he said amounted to $7,000. Wright then offered to sell for $5,000, and McCabe agreed. "[H]appy to be getting some money," she understood that McCabe would pay the property taxes separately from the money paid to her. Wright believed that, without this deal, she would simply lose the property to tax foreclosure. In her deposition, Wright testified that the value of the house did not matter to her in the negotiations. At trial, she also stated that the exact amount of taxes owed on the house did not matter to her. Wright testified that, had she known the taxes were paid on the property and that she was not in danger of losing it, she would have not sold the house for any price. .

McCabe's version of the transaction varies in several respects. McCabe recalled that, although Wright was "very

demonstrative" during their conversation, he could not tell that she had been drinking. He said that he asked her if she was "aware of the tax situation" on the property, to which she responded, "[y]eah, yeah, I'm aware of it." McCabe said that Wright immediately offered to sell the property for $5,000, to which he agreed. McCabe said that only after agreeing on a selling price did Wright express an interest in consulting with her mother and an attorney. He admitted that he discouraged Wright from consulting with an attorney. McCabe also recalled that Wright asked him what he thought the value of the property was at the time, which he answered by remarking that he "personally had not seen the property." He said that Wright cut him off at that point by saying that she thought the value of the property was $100,000, to which he replied that she might well be correct.

At this point the versions reconverge. McCabe produced a standard preprinted bargain and sale deed form that he had brought with him. He and Wright drove to a local hotel, found a notary, and completed the execution of the documents. McCabe paid Wright $1,700 in cash and gave her a personal check for the balance. McCabe then bought Wright a drink at the hotel bar. Wright then asked McCabe to drive her to a used car dealership so that she could buy a car with the cash from the sale. After dropping Wright off at the dealership, McCabe returned to Portland.

The following day, Wright had difficulty cashing McCabe's check that had been drawn on an Oregon bank. She called McCabe, upset because she thought he was trying to avoid paying the balance of the purchase price. McCabe contacted an investigator in Anchorage and arranged for the investigator to deliver a cashier's check for the balance. McCabe had discovered that the deed contained several minor errors,[1] so he had the investigator also deliver to Wright a corrected deed to sign.[2] On April 21, when Wright

---

[1] Several sentences on the form should have been deleted, and the form referred to the "County of Anchorage" instead of the "Municipality of Anchorage."

[2] McCabe testified that, in his opinion, the April 19 bargain and sale deed was valid and effective despite the minor errors. He indicated that, even if Wright had refused to sign the corrected deed, he likely would not have withheld the balance of the purchase price. As such, I conclude that the parties' transaction took legal effect on April 19, not April 21.

saw the new deed, she thought that perhaps she had made a bad deal, but told a friend who was with her at the time that she believed that there was nothing she could do about it at that point because the money already had been spent.

Mariah then discovered that McCabe had obtained title to the property. Mariah initiated an action against McCabe for the imposition of a constructive trust, asserting that—by virtue of Mariah having already paid $20,000 in back taxes on the property—it should be declared either half-owner of the property or a joint venturer with McCabe to purchase the property. Mariah later amended its complaint, abandoned its constructive trust theory, and asserted a claim for a statutory lien in the amount of the taxes that it had paid.

In the meantime, Mariah contacted Wright and told her that the property was worth much more than McCabe had paid her for it. Wright and Mariah then entered into an agreement that led to the filing of the second action. Wright agreed to initiate an action for the rescission of the sale of the property to McCabe. Mariah agreed to finance the lawsuit and to pay Wright's personal expenses during the trial. The parties agreed that, if Wright obtained rescission of the transaction, then she would transfer title to the property to Mariah in exchange for $50,000. Wright then initiated the rescission action, claiming fraud and unilateral mistake as grounds for rescission of the sale. As to the fraud allegations, Wright contended that McCabe misrepresented the physical condition, tax status, and market value of her property and that she would not have sold the property had she known the truth about those matters. As to the unilateral mistake allegations, Wright contended that, when she sold the property to McCabe, she mistakenly believed: (1) that she already had lost the property to foreclosure because of the unpaid taxes; (2) that the property was in poor condition; and (3) that $7,000 in back taxes remained owing on the property. McCabe answered, denying Wright's allegations and alleging that, in any event, Wright was not entitled to rescission because she had been grossly negligent in selling her property without making any effort to ascertain its tax status or physical condition.

The lien and rescission cases were consolidated for trial. After a bench trial, the court rejected Wright's fraud claim but concluded that Wright was entitled to rescind the sale of the property based on unilateral mistake as to the value of the property:

> "That is the mistake. * * * And so my point is, when you have got a man of [McCabe's] sophistication, who knows how to turn those kinds of things into what the real market value is, when he sees this person eager to sell for $5,000, * * * something that is obviously worth 10, 15 times more than that, as a matter of absolute common sense, how can a trier of fact not reach the conclusion that he should have known she didn't get it? * * * That is a huge, material unilateral mistake of fact entitling her to relief."

The trial court rejected McCabe's contention that Wright's failure to ascertain the value, condition, and tax status of her property amounted to gross negligence. The court also held that, because, under the terms of the agreement between Mariah and Wright, Mariah would succeed to the ownership of the property, its claim for a lien on the property had been rendered moot.

On appeal, McCabe first argues that the trial court erred in rescinding the agreement to sell the property to him. McCabe offers a number of arguments in support of that assignment, among them that Wright was not, in fact, mistaken as to the value of the property, that mistake as to value is not a mistake of fact that justifies rescission, and that Wright was grossly negligent in selling the property to McCabe without making an effort to ascertain the tax status and true condition of her own property. Wright contends that she was mistaken as to value and that mistake as to value can justify rescission in some circumstances. Wright contends that, in any event, she clearly was mistaken as to the physical condition of the property and the existence of back property taxes owed on it at the time of sale and that those mistakes justify the remedy of rescission. Wright insists that, at the worst, her failure to ascertain the relevant facts about her property, under the circumstances, amounted to ordinary negligence, not gross negligence.

■ I agree with the trial court's conclusions rejecting Wright's allegations of misrepresentation and fraud. I would hold that Wright's unilateral mistake of fact concerning the existence of back property taxes merits rescission of the deed of sale and that Wright was not grossly negligent. For that reason I do not address Wright's arguments regarding the value and condition of the property.

■ To avoid a contract due to a unilateral mistake of fact "it is necessary that there be a mistake, that the mistake is basic and known to the other party, or that circumstances are such that the other party, as a reasonable person, should have known of the mistake." *Gardner v. Meiling*, 280 Or 665, 674, 572 P2d 1012 (1977). In particular, there must be "a misapprehension as to a fact which is material and basic to the agreement," *id.* at 674-75, not just a failure in using "good business judgment," *Shea v. Begley,* 94 Or App 554, 557, 766 P2d 418 (1988), *rev den* 307 Or 514 (1989). Indeed, "[e]quity will not relieve a party of an improvident bargain simply because his opinion of its value proves incorrect." *Meiling,* 280 Or at 675. Further, the remedy of rescission will not be permitted if the mistaken party was "guilty of gross negligence in making the mistake." *Id.* Thus, if a party simply undervalues a piece of property, then equity will not relieve that party, unless the "offer is so inconsistent with the true value of the bargain that a reasonable person would know the offeror made a mistake in his evaluation." *Id.* More specifically, the mistake in evaluation has to be regarding a fact in existence at the time the contract was entered, *Murray and Murray,* 120 Or App 216, 219, 852 P2d 204 (1993), and the fact must be "fundamental in character," relating to the " 'intrinsic nature of the bargain,' " *Shop. Centers v. Stand. Growth Prop.,* 265 Or 405, 422-23, 509 P2d 1189 (1973) (quoting 13 Samuel Williston, *Contracts* 94, § 1544 (3d ed 1970)).

Credibility of the witnesses plays a large role in assessing the merits of the claims in this case. Thus, I give substantial weight to the trial court's findings regarding credibility. *Bogle v. Paulson,* 185 Or 211, 228, 201 P2d 733 (1949). The trial court found that Wright's testimony was not credible because she had a "powerful motive, at the financial behest of Mariah, to say whatever Mariah wants her to say."

It, however, also found that Mariah and McCabe had significant financial incentives "to shade things" as well and that "there is enough dirt here to go all around the block and back on every single one of these parties." The trial court explained:

> "My view of Ms. Wright's situation was that she, indeed, believed she did not own anything that night. Her mother believed she didn't own anything that night. And when [McCabe] drops out of heaven into her life unexpectedly and says he is willing to buy something she doesn't even think she owns, she is going to act on it right now, right then, because he is the guy with the cash, and he might not be there tomorrow.

> "And while both of them agree that she said something about wanting to talk to her mother and something about wanting to talk to an attorney, I have very serious doubt about whether she was really going to do that, even if he had given her that opportunity. Because in her reality, this was such an unexpected opportunity from her perspective, that she didn't probably want to wait till tomorrow. She wanted to take whatever this opportunity to get something for nothing was going to bring."

I take from these findings and from the record as a whole that, while the trial court distrusted the principal parties, it specifically chose to believe key portions of Wright's testimony, enabling her to secure rescission of the contract. I agree with the trial court's assessment of credibility and apply it to the questions relevant on appeal: (1) was Wright actually mistaken about the back taxes owed on the property; (2) was that mistake material and basic to the contract; and (3) did McCabe know or should he have known about that?

I infer from the trial court's "view of Ms. Wright's situation" that the trial court believed that Wright thought that back property taxes were owed. The trial court was aware that Wright's last business contact with the property involved only partial payment of the back taxes and that Wright had never received any notice from Multnomah County or from Mariah that Mariah exercised Wright's redemption right and paid the $20,000 in property tax.[3] Likewise, McCabe did not inform Wright of the details of the "tax

---

[3] Indeed, ORS 311.250 provides that tax statements are mailed on October 25 of each year, in this case six months after the conveyance to McCabe.

situation." Indeed, given Wright's testimony that she thought taxes were owed on the property and that, as a consequence, foreclosure was imminent, the trial court's conclusion that Wright took the opportunity "to get something for nothing" indicates the trial court believed this testimony. In concert with the trial court, I conclude that Wright believed taxes were owed on the property the night she sold it to McCabe.

McCabe was aware or should have been aware of Wright's mistaken belief regarding the back taxes and that this belief entered into her decision in selling and valuing the house. McCabe knew about Wright's education level and financial situation and could anticipate her lack of sophistication in real estate matters. McCabe also knew that tax notices were sent first to the property itself and then to the last known address of the taxpayer and, as a real estate specialist, likely knew that the notices would not find their way to Wright in Alaska until October 1995, if at all. Additionally, McCabe had to inform Wright that she still owned the house. That was followed by McCabe's oblique question, "are you aware of the tax situation" to which Wright replied "yeah," which does nothing to expressly clarify whether Wright knew the taxes had been paid.[4] This exchange was, according to McCabe, immediately followed by Wright's $5,000 offer. Consistent with the trial court's holding, I would not hold that those events present any evidence of misrepresentation. However, given the character and sequence of events, I find it difficult to believe that the great disparity between market value and Wright's offer did not alert McCabe, as a reasonable person and an acute business person, that Wright was mistaken as to the existence of back property taxes.

McCabe nevertheless argues that any mistake regarding the existence of taxes was not material and basic to Wright's offer to sell. He points to Wright's testimony that she cared about neither the value of the property nor the taxes owed on the property. He asserts that Wright was a "motivated seller" who set the price at $5,000 because that

---

[1] Indeed, I find that this exchange tends to say the exact opposite, that Wright thought taxes were owed on the property for which the property was subject to imminent foreclosure.

was its value to her. He claims that, even though Wright stated that she thought the property's value was $100,000, she set the price at $5,000 because, as she testified, it "seemed like a lot of money" to her at the time, and, therefore, that was the value of the property to her at the time. I do not agree.

I concur with the trial court's finding that Wright did not understand the value of her property, and I do not believe Wright articulated this $100,000 value to McCabe. Additionally, though Wright testified that the property taxes did not really matter to her, Wright's indifference related not to the existence of the back taxes, but to the amount of them. She "figured [McCabe] looked like he had money" and concluded "he could worry about" the taxes after he gave her the money. Indeed, Wright specifically testified that, but for the existence of the back property taxes, she would not have sold the property that night to McCabe. I believe that testimony given the fact that Wright anticipated foreclosure and did not think she could find a buyer willing to purchase the house with its attendant tax liability.

I also find that, regardless of how motivated Wright was to sell, she factored the existence of the property taxes into her asking price of $5,000.[5] The fact, as McCabe points out, that Wright testified that "$5,000 seemed like a lot of money" to her at the time does not mean that she did not factor the existence of the back property taxes into her asking price, merely that she was influenced by several factors in setting that price. Wright testified, and I have no reason to disbelieve her, that she believed that, due to the back property taxes, she could not sell the property and that her perception of the deal was that McCabe would "pay the taxes, and then he wanted to pay [her], and then he could have the house." Therefore, I conclude that, in this case, the mistaken belief that taxes were owed is "fundamental in character"

---

[5] While I agree with the trial court that McCabe probably did not tell Wright that $7,000 was the amount of the back property taxes and that Wright likely came up with that figure on her own from her last tax payments on the property, I think that Wright may have, in fact, contemplated that amount at the time of the sale. Regardless of the amount, however, my analysis rests on the very existence of the back property taxes, not the amount of them.

and relates to the "intrinsic nature of the bargain." *Shop. Centers,* 265 Or 422-23.

■     I last turn to McCabe's argument that, even if Wright was the victim of a unilateral mistake of fact, it was the result of Wright's own gross negligence. That issue is the focus of the dissent's disagreement with this concurrence. The dissent argues that while Wright's mistakes about the property might justify rescission of the contract of sale, her "gross negligence" bars that remedy. It is able to reach that conclusion, however, only after ignoring the unique circumstances of this case and after extending a legal presumption beyond its *public* policy confines.

Again, I agree with the trial court's assessment of the parties' "around the block and back" dirt, concerning their dispute over a small parcel of it. By that assessment, the dissent would seem to shade its analysis of Wright's duty to investigate the status of her property. I, however, cannot escape the fundamental character of the circumstances surrounding the sale of Wright's property. As noted above, McCabe, with a ready-to-use bargain and sale deed form and a cash down payment in pocket, flew to Alaska and insisted on an evening meeting with Wright, even though he was aware that she was attending a party. McCabe was also aware of many things that Wright was not: the value of her property; the fact that Mariah had exercised Wright's right of redemption from the tax foreclosure sale; and a wealth of technical and legal information from his training as a professional distressed properties broker.

Before her meeting with McCabe, Wright was aware only that the property had back property taxes owed on it and assumed that it was foreclosed by the county. That assumption was correct until Mariah paid the redemption price to restore title in late 1994. Wright did not know the value of the property and knew little to nothing about property transactions. She did not even understand that she could sell the property while she still owed taxes on it but thought she was "getting away" with selling nothing for something through McCabe's offer. Regardless of the disputed facts, Wright understood the essence of McCabe's offer to buy, which was time restricted to the evening of April 19.

Rescission is allowed only "if the offeror is not guilty of gross negligence in making the mistake." *Gardner,* 280 Or at 675. The dissent correctly notes that, in the context of mistakes of fact, a party is grossly negligent if it fails to obtain information "readily available" to it. *Walcutt v. Inform Graphics, Inc.,* 109 Or App 148, 152, 817 P2d 1353 (1991), *rev den* 312 Or 589 (1992). Thus, a party must "take reasonable measures to inform" itself. *Id.* In *Rosboro Lumber Co. v. Apsel,* 144 Or App 298, 926 P2d 329 (1996), *adhered to on recons* 146 Or App 333, 932 P2d 110 (1997), *rev den* 326 Or 530 (1998), we elaborated on that standard. There, we assessed "whether it would be unreasonably difficult *under the circumstances* for the party * * * to perform an independent investigation." *Id.* at 303-04 (emphasis added). In that case, there was "a complete absence of evidence that it would have been unreasonably difficult for [the parties] to conduct an investigation[.]" *Id.* at 304. The dissent does not adequately take into consideration the unique circumstances surrounding the transaction in this case affecting Wright's ability to conduct an investigation.

Because I read the record to show that McCabe's offer to buy was open only through the evening of April 19, I consider Wright's options for investigation during that evening in assessing whether information about the tax status of her property was "readily available." First, Wright justifiably assumed that her property had been foreclosed by the county. Due to this foreclosure and the timing of Mariah's redemption, no current tax notices would have been sent to the property, Wright, or her mother until October 1995, signifying her continued ownership. Second, even had Wright known whom to call in Oregon about foreclosure or taxes, she would have not been able to reach anyone to inquire about the taxes because it was after 6:00 p.m. in Oregon. Additionally, even had Wright spoken with her mother, her mother did not possess any information to correct her misapprehension about the taxes. Finally, even had Wright attempted to acquire the services of an attorney, it is questionable, as McCabe noted, whether she would have been able to reach an attorney after 5:00 p.m. and whether that attorney would have been able to correct the misconceptions Wright harbored regarding the back property taxes. Therefore, I cannot say that Wright was

grossly negligent in failing to undertake an independent investigation that, *under the circumstances,* was unlikely to correct her mistake of fact concerning the tax status of her property.

The dissent, in neglecting fully to consider the circumstances of the transaction, bolsters its position by noting that the "the law imposes [on Wright] an affirmative obligation to remain informed" about the tax status of her property. 163 Or App at 111 (relying on *Grant County v. Guyer,* 296 Or 14, 21, 672 P2d 702 (1983)); *see also Knapp v. Josephine County et al.,* 192 Or 327, 353, 235 P2d 564 (1951). However, the case employed by the dissent to illustrate that point, illustrates a compelling point contrary to the dissent's conclusion. *Grant County* states that:

> " 'Taxes * * * are the *lifeblood of the state * * *. * * * [T]he law of taxation places upon property owners the duty to keep themselves informed about the recurrent *liability* of their property for taxes, and *charges them with knowledge that neglect to pay a tax will result in foreclosure proceedings.'* " 296 Or at 21 (quoting *Knapp,* 192 Or at 353) (emphasis added).

Thus, even if an owner does not actually know about the tax liability of her property, that knowledge will, in essence, be imputed to uphold the validity of a tax foreclosure sale. Any affirmative duty imposed on Wright is imposed in the foreclosure of property tax liens statutes, ORS 312.005 through ORS 312.990. Those statutes presume that a person knows taxes are *owed* on the property to reduce any impediments to the *government's* foreclosure sale.

ORS 312.214 declares that the public policy of county tax foreclosure is to ensure that the county's title "shall have the utmost stability" and to impose on persons claiming an interest in foreclosed property a continuing duty to investigate and ascertain whether such real property was or shall be foreclosed. In order to accomplish and place into effect that public policy, ORS 312.216 provides that persons claiming an interest in real property are deemed to know that taxes are assessed and due each year, that on delinquency a tax lien will be placed on the property, and that if the delinquency is not cured foreclosure will ensue. In construing the

property foreclosure statutes, the Oregon Supreme Court noted that "[t]he state has an important need to collect taxes that are due it. To accomplish this objective the laws of this state contain an elaborate statutory scheme designed to ensure efficiency and fairness in carrying out that objective." *Grant County,* 296 Or at 22. Thus, in the statute, the imputed knowledge of taxes and foreclosure is directly designed to serve an important public policy interest.

The dissent instead would apply that principle in reverse and in favor solely of a private party. According to the dissent, Wright is imputed to know that the taxes, which *she actually knew were owed and for which tax foreclosure did in fact occur*, are *no longer owed* because an *intervening third party* exercised Wright's *redemption right after her statutory right of redemption had expired*. The dissent overlooks the obvious limits of the statutory presumption, as well as the rationale underlying that presumption. First, *Knapp* explained that the ability to impute notice of tax liability stems from the fact that "taxes are collected periodically under fixed laws which, in a restricted sense, impart their own notice." *Knapp,* 192 Or at 341 (quoting *Spitcaufsky v. Hatten,* 353 Mo 94, 111, 182 SW2d 86 (1944)). Here, the dissent would abandon that rationale by expanding Wright's imputed knowledge to cover not only her tax liability but also to the actions of third parties independently intervening after a foreclosure sale had concluded and after that sale could, statutorily, be disturbed. Such activities are far from periodic and thus do not " 'impart their own notice.' " *Id.*

Second, the Oregon Supreme Court has recognized a fundamental difference between private litigation and tax foreclosure actions. Requirements to meet due process in tax foreclosure are less stringent because of the " 'government's exigent need for * * * pecuniary support,' " the " 'futility of impeding the annual collection of taxes,' " and the self-noticing nature of tax assessments. *Id.* at 341. Such considerations do not apply in private litigation, imposing higher obligations to provide adequate notice of litigation to meet the due process standard. Thus, the Supreme Court has noted a distinction in the application of imputed knowledge of tax obligations outside of the tax foreclosure context.

In sum, the dissent overlooks the tax foreclosure statutes' language that deems Wright to know only that taxes are assessed and owed on a property and furthers the goal of ensuring the stability of the county's title through foreclosure proceedings. Instead, the dissent would impute knowledge of a third party redeeming title from the county after Wright's statutory right of redemption had expired and satisfying the tax obligation. It would do so to effect the sale of property without impediment to a private party at an artificially low price. Under the circumstances of this case and because I can find no public policy served by doing so, I would decline to extend that presumption here.

I, therefore, conclude that Wright was not grossly negligent where the negligence was exacerbated by the circumstances of the deal and shrewdly manipulated by McCabe. I would affirm the trial court's judgment because Wright's unilateral mistake of fact regarding the tax status of her property merits rescission of the sale. McCabe had no affirmative duty to provide Wright with information; however, the equities of the situation reveal that he risked rescission of the deed of sale where, superior in knowledge and sophistication, he knew or should have known that Wright was under a misapprehension of fact and nevertheless courted that misapprehension by his participation in the transaction.

Deits, C. J., and DeMuniz, Haselton and Armstrong, JJ., join in this concurrence.

**LANDAU, J.,** dissenting.

The concurrence would hold that Wright is entitled to rescind her agreement to sell her property for $5,000, because she mistakenly thought that taxes were owing and that foreclosure was imminent. The concurrence concludes that, although her failure to ascertain the tax status of her own property certainly was negligent, it was not so negligent as to prohibit rescission. In so concluding, the concurrence neglects to apply controlling precedent to the contrary and, in the process, would significantly expand the grounds for rescission of a contract. I dissent.

I take the facts as reported by the concurrence. I therefore assume for the purposes of this opinion: (1) that "McCabe did not pressure [Wright] into the selling the property, but that she understood that [McCabe] was in a hurry to conduct business with her 'right then' so that he could return to Portland," 163 Or App at 96; (2) that Wright did not know of the tax status of her property, indeed, that "the exact amount of taxes owed on the house did not matter to her," 163 Or App at 96; and (3) that Wright and McCabe did not finally sign the transaction papers until the following day, 163 Or App at 97. I also note that the trial court found no evidence of fraud and that Wright does not assert claims of duress or unconscionability in this case. The question before the court thus is a narrow one: In the absence of fraud, unconscionability, and duress, is it gross negligence for a property owner to sell her property without knowing or attempting to ascertain its value or condition? In my view, the answer is clearly yes. No reasonable person would sell her property without making the slightest effort to inform herself about the nature of what she is selling.

The law is that a mistaken party is not entitled to rescission on the basis of the mistake if he or she was "guilty of gross negligence in making the mistake." *Gardner v. Meiling*, 280 Or 665, 675, 572 P2d 1012 (1977). It is for the mistaken party to prove the negative, that is, that he or she was not grossly negligent. *Jensen v. Miller*, 280 Or 225, 230, 570 P2d 375 (1977).

At the outset, it bears emphasis that it is Wright's burden to prove the negative, that she was *not* grossly negligent. I emphasize the point, because, in this case, Wright made no effort to satisfy that burden. Indeed, of the entirety of her brief on appeal, she devotes three paragraphs to the issue. She first asserts that she was not grossly negligent because she assumed there was no way to ascertain the relevant information. Of course, that is mere question-begging. The very point at issue is whether she was grossly negligent in making such an assumption. She then argues that, in any event, the sort of negligence of which she was guilty was not the sort that bars equitable relief, because it did not involve the violation of an affirmative legal duty. That argument is simply incorrect as a matter of law. The cases do not require

the violation of an affirmative duty before gross negligence will bar equitable relief. *See, e.g., Main v. Howard*, 52 Or App 797, 804, 629 P2d 870 (1981) (reformation not available because, among other things, the plaintiff was grossly negligent in failing to read relevant transaction documents).

Thus, without proceeding any further in the analysis, it is clear that Wright cannot prevail. She has failed in her burden. She has made no attempt to demonstrate that she was not grossly negligent in failing to ascertain the facts about her property before selling it.

The concurrence ignores that point and attempts to satisfy her burden for her. The concurrence reasons that, under the "unique circumstances" of this case, Wright was negligent, but not grossly so. The "unique circumstances" boil down to the fact that Wright relied on McCabe's representations as to the tax status of her property. The concurrence's reasoning does not bear careful examination, however.

In assessing whether the mistaken party was grossly negligent, we look to the extent to which the correct information was readily available. Instructive in that regard is our decision in *Walcutt v. Inform Graphics, Inc.*, 109 Or App 148, 817 P2d 1353 (1991), *rev den* 312 Or 589 (1992). In that case, we held that the plaintiff could not rescind a release on the basis of a mistake of fact when the information about which she was mistaken was readily available to her. More to the point, we held that the plaintiff had no right to rely on information supplied by the other party to the agreement when she had ready access to the same information. *Id.* at 152.

Whether correct information is "readily available" depends on whether it would have been unreasonably difficult for the mistaken party to obtain it. For example, in *Rosboro Lumber Co. v. Apsel*, 144 Or App 298, 926 P2d 329, *adhered to* 146 Or App 333, 932 P2d 110 (1996), *rev dismissed* 326 Or 530 (1997), the owners of timber property relied on representations of the buyer as to the quantity of harvestable timber on the land. When the buyer's estimates turned out to be incorrect, the owners refused to permit the buyer to fell the timber on their land. The buyer sued for specific performance, and the owners alleged as an affirmative defense their

mistake as to the quantity of harvestable timber on their land. We held that the owners could not avail themselves of that defense, because

"there is a complete absence of evidence that it would have been unreasonably difficult for [them] to conduct an investigation to determine the harvestable timber on their own property."

144 Or App at 304.

This case is not materially different from either *Walcutt* or *Rosboro Lumber*. There is no question but that the correct information about the value and tax status of Wright's property was readily available to her and that it would not have been unreasonably difficult for her to conduct an appropriate investigation to ascertain the true state of affairs as to her own property. Indeed, it is generally presumed that an owner is aware of the value and condition of his or her property. *See, e.g., Mitchell v. Chernedir*, 286 Or 285, 291-92, 593 P2d 1163 (1979) (property owner presumed to know of applicability of zoning ordinance); *Hobgood v. Sylvester*, 242 Or 162, 166, 408 P2d 925 (1965) (personal jurisdiction over nonresident property owners based on "presumption that a person ordinarily keeps track of his property"); *Lewis v. Worldwide Imports, Inc.*, 238 Or 580, 584, 395 P2d 922 (1964) (property owner is permitted to render opinion as to property value because of presumption that owner is familiar with the property and its uses); *Slak v. Porter*, 128 Or App 274, 279, 875 P2d 515 (1994) (adverse possession may lie against owner who, in fact, does not know of adverse use if use is such as to put on notice a reasonable property owner who would keep track of the condition and use of his or her property).

Moreover, as to the tax status of property, the law imposes an affirmative obligation to remain informed. *Grant County v. Guyer*, 296 Or 14, 672 Or 702 (1983), well illustrates the point. At issue in that case was the constitutionality of notice of tax foreclosure by publication. In holding that publication sufficed, the court commented:

" 'Taxes, as has been many times stated, are a very practical matter. They are the lifeblood of the state, and the property owner's most intimate liaison—although often a

waspish one—with the state. In construing tax statutes, it must be borne in mind that *the law of taxation places upon property owners the duty to keep themselves informed about the recurrent liability of their property for taxes,* and charges them with knowledge that neglect to pay a tax will result in foreclosure proceedings.' "

*Id.* at 21 (quoting *Knapp v. Josephine County,* 192 Or 327, 353, 235 P2d 564 (1951)) (emphasis added).

Wright offers neither argument nor evidence that she made any effort to ascertain the value or condition of her property, much less that it would have been unreasonably difficult—indeed, difficult at all—to obtain the relevant information. Accordingly, she has failed in her burden and is not entitled to rescission.

The concurrence ignores the general point—and the cases in support of it—and seizes on my mention of the tax statutes. It argues that an owner is not obliged to remain informed about the tax status of her property unless foreclosure proceedings are pending, because only then are taxes *owed.* 163 Or App at 106. It is a makeweight argument, however.

To begin with, it seems to me a matter of common sense that either a property owner has a duty to keep apprised of her property or not. Indeed, to conclude that one does not have to ascertain whether taxes are owing until foreclosure proceedings already have begun has a sort of *Alice in Wonderland* quality to it. In any event, the law is to the contrary. The duty is not limited to ascertaining whether taxes already are *owed.* The statute provides that owners of real property have "a *continuing duty* to investigate and ascertain *whether* [their] real property did become *or hereafter shall become*" subject to foreclosure proceedings. ORS 312.214(1) (emphasis added).

Even assuming that tax law imposes no affirmative obligation to remain abreast of the tax status of one's property, the fact remains that Wright's failure to ascertain such information before selling the property finds no excuse in the record. She made absolutely no attempt to inquire and offers no argument that the information could not readily have been ascertained with a minimum of effort.

The concurrence offers two justifications of its own for concluding that Wright was not grossly negligent. First, the concurrence complains at length about McCabe's sophistication and about his mercenary intentions. I am prepared to accept, for the purposes of this opinion, that McCabe was as venal as the concurrence suggests. It still does not change the fact that accurate information was readily available to Wright. As the trial court held, this is not a case in which there is evidence of duress, fraud, or coercion. The fact is that nothing that McCabe did or said prevented Wright from ascertaining the accurate status of her property.

Second, the concurrence suggests that, because of the lateness of the hour and McCabe's demands for an immediate decision, Wright realistically had no opportunity to determine the status of her property. The concurrence never explains why, in the absence of fraud or duress, a buyer's insistence on a speedy decision excuses a seller from knowing the facts about his or her own property. That, so far as I am aware, is an entirely novel proposition of law.

Aside from that, on the record of this case, the concurrence's excuse makes no sense. There is no question that McCabe said that he was in a hurry. But the fact remains that, although the parties agreed to the sale the evening of April 19, the papers were not finally signed until the following day. I do not understand, and the concurrence never explains, what prevented Wright from calling an attorney or otherwise ascertaining the true status of her property the morning of April 20.

The concurrence's reasoning thus boils down to the proposition that Wright's negligence was excused by McCabe's bad intentions. I know of no such rule of law and do not believe that the facts of this case warrant its adoption. The fact is that Wright was ignorant of the status of her property, and nothing that McCabe said or did prevented her from remedying her ignorance. Under the circumstances, she should not be heard to complain that she could have obtained a better deal had she but known the facts.

Buyer's or seller's remorse in real estate transactions is common. Individuals easily may form mistaken impressions about value, property condition, even liens and

tax liabilities. But the law does not afford a remedy for such remorse except on very narrow circumstances. The concurrence's opinion would change that, and, in my view, such a change would be ill-advised.

Edmonds, Linder, Kistler, and Brewer, JJ., join in this dissent.